**LeBLANC, INC., Appellant,**

v.

**GULF BITULITHIC COMPANY et al., Appellees.**

**No. 245.**

Court of Civil Appeals of Texas.

Tyler.

Feb. 9, 1967.

Rehearing Denied March 9, 1967.

Fulbright, Crooker, Freeman, Bates & Jaworski, St. John Garwood, Jr., Houston, for appellant.

Vinson, Elkins, Weems, & Searls, John T. Golden, Houston, for Gulf Bitulithic Co.

Baker, Botts, Shepherd & Coates, Ralph S. Carrigan, Houston, for Atlas Air Conditioning Co.

Fouts, Moore, Caldwell & Coleman, Joe E. Coleman, Houston, for Muhl Electric, Ltd.

MOORE, Justice.

This is a suit by a subcontractor against a prime contractor wherein the prime contractor filed a cross-action and a third party action against other subcontractors. Appellant, LeBlanc, Inc., the prime contractor, contracted to construct a maintenance base for Eastern Airlines at Houston International Airport. The work consisted of the erection of a base building, together with a concrete apron or runway surrounding the building. As general contractor, LeBlanc entered into a subcontract with appellee, Atlas Air Conditioning,[1] for the plumbing and air conditioning work. The paving work was subcontracted to appellee, Gulf Bitulithic Company,[2] and the electrical work was subcontracted to Muhl Electric Ltd.[3] As a part of its contract, Atlas was required to lay a three-quarter inch underground pipeline to carry a chemical known as "varsol." Approximately four months after the

1. Hereinafter referred to as "Atlas."

2. Hereinafter referred to as "Gulf."

3. Hereinafter referred to as "Muhl."

line had been laid, it was discovered that there was a leak in the line and that the escaping varsol had seriously damaged the insulation on certain electrical lines which had also been laid underground nearby. Eastern Airlines demanded that LeBlanc replace the damaged cables. Before proceeding to replace the damaged electrical cables, LeBlanc called upon Atlas to make good the damages caused by the leak in the line, taking the position that Atlas was obligated to do so under its subcontract. LeBlanc also called upon Gulf to make the repairs to the damaged electrical cables on the ground that the break in the varsol line was caused by the negligence of Gulf. Atlas acknowledged its responsibility to repair the defect in the varsol line and made the necessary repairs, but refused to make good the damages to the electrical cables. Gulf denied responsibility for breaking the varsol line and likewise refused to make good the damages to the electrical cables. The electrical system had previously been installed by Muhl under a subcontract. When Atlas and Gulf refused to repair the damages, LeBlanc again employed Muhl to re-lay the lines at a cost of $26,000.00. LeBlanc refused to pay Gulf the balance due upon the paving contract, and Gulf originated this litigation by suing LeBlanc for the balance due. LeBlanc filed a cross-action against Gulf alleging that the damage to the electrical cables was proximately caused by Gulf's negligence, thus claiming an offset. LeBlanc also filed a third party action against Atlas for damages for breach of its subcontract and alternatively alleged that the damages were caused by the negligence on the part of Atlas in constructing the lines. Atlas answered with a general denial and a cross-action against LeBlanc for the amount due and owing upon its subcontract.

The case was tried before a jury. There being no dispute as to the balance due and owing upon each of the appellees' subcontracts, the cause was submitted only upon LeBlanc's cause of action for damages against appellees Atlas and Gulf. The jury returned a verdict exonerating both Atlas and Gulf of liability for the damages to the electrical cables.

Based upon the jury verdict, the trial court entered a take-nothing judgment against LeBlanc and rendered judgment for Atlas and Gulf for the amounts due and owing them upon their subcontracts. Judgment was also rendered in favor of Muhl Electric.

Prior to entry of the judgment, LeBlanc filed a motion for judgment non obstante veredicto, contending that the evidence showed as a matter of law (1) that Atlas had breached its contract; (2) that Atlas was guilty of negligence proximately causing the damages, and (3) that Gulf was guilty of negligence proximately causing the damages. The trial court overruled the motion, as well as the motion for new trial, and appellant duly perfected this appeal. Appellant has subsequently stated to the court in the brief that appellant did not desire to further prosecute this appeal against Muhl and therefore the appeal insofar as it affects Muhl Electric Ltd. will be dismissed.

■ In order to properly understand the appellant's points of error, a review of the record will be necessary. In so doing, we shall follow the familiar rule that the evidence must be viewed in a light most favorable to the parties obtaining the verdict and judgment. Biggers v. Continental Bus System, Inc., 157 Tex. 351, 298 S.W.2d 79, 303 S.W.2d 359.

The record shows that LeBlanc entered into the contract with Eastern on May 13, 1960. Shortly thereafter, LeBlanc entered into subcontracts with appellees Atlas, Gulf and Muhl. In July, 1960, Gulf commenced its work and poured a 13-inch cement airport apron slab and a 6-inch parking slab. At that time a 20-foot unpaved strip was left adjoining the maintenance building so that the pipeline trenches for the plumbing could be dug by the plumbing contractors. Gulf left the job about August 15th; thereafter, Atlas commenced upon the plumbing

contract. Under the terms of the subcontract, Atlas had the duty of laying three underground pipelines on the west and north sides of the maintenance building. These lines consisted of a water line, an air line and a three-fourths inch galvanized varsol line. The trench was dug and the lines were laid along the west side of the building running north. At the northwest corner of the building, the lines turned east and ran along the north side of the building. At the northwest corner of the building, the lines crossed over electrical cables which had previously been installed and it therefore became necessary at this point to elevate the plumbing lines approximately one foot. This was accomplished by what is known as a "riser." An elbow was installed at the bottom and at the top of the riser. After the varsol line had been installed, it was tested under pressure and found to be satisfactory by the architect. After the plumbing lines had been laid, Atlas backfilled the trench except for a distance of 30 feet on each side of the corner of the building, which was left open for the purpose of allowing the gas and sprinkler contractor to lay their lines in the trench. During the four to six weeks' period in which the trench was left open, there was considerable work activity in the vicinity of the northwest corner of the building by various contractors, i. e., Atlas, LeBlanc, Gulf, the masonry subcontractor, the gas company, and the sprinkler contractor. There was no evidence as to who actually backfilled the ditch at the corner of the building, or when it was done. Gulf returned to the job on November 7, 1960, to complete the paving. At that time the trench had been completely filled; however, Gulf had to clean out a portion of the ditch, inasmuch as it was filled with water and mud, in order to re-make the subgrade in the 20-foot strip previously referred to. The ditch was "mucked out" by Gulf, whose employees used a large piece of heavy equipment known as a backhoe. The removal of the wet dirt and mud from the ditch was done on November 11, 12 and 14, 1960, and was backfilled at that time with cement stabilized sand. Prior to the time Gulf removed the wet dirt and mud from the ditch, there had been heavy rains and the soil over the pipe had settled. At that time, the ditch at the northwest corner of the building had already been backfilled. It was highly disputed in the evidence as to whether Gulf removed any mud from the northwest corner, the Gulf employees taking the position that this particular corner was in good condition and did not need cleaning out and therefore Gulf did not use the backhoe at this particular place; however, they admitted Gulf refilled the remainder of the trench with cement stabilized sand and paved the entire 20-foot strip around the north and west sides of the building.

On February 15, 1961, some three months after Gulf had paved over the line, the break in the riser of the varsol line at the northwest corner of the building was discovered. It was then determined that the varsol had seeped into the electrical manholes, ran down the electrical conduits between the manholes, and had destroyed the insulation on the underground electrical wiring system.

The testimony shows that the break occurred just below the upper elbow on the riser at the point where the pipe had been threaded. The break was at the outer side of the elbow and ran horizontal with the threads. While none of the witnesses purported to know what caused the break, they all seemed to agree that the break was caused by the application of some external force. According to Atlas's witnesses, the break was probably caused by the application of some external force applied from above the riser. There is nothing in the testimony to suggest that the break was caused by a defect in the pipe or by the quality of the material, nor is there anything in the evidence to suggest that the break was caused by defective workmanship in preparing the pipe and laying the line.

Upon being notified of the break in the line, Atlas repaired the defect but declined to assume any responsibility for the damages to the electrical system. Gulf likewise de-

nied that it was responsible for the damages.

In response to the special issues submitted by the court, the jury found: (1) that Atlas failed to backfill the trench at the northwest corner of the building within such time as it would have been backfilled by a person of ordinary prudence in the exercise of ordinary care; (2) but that such failure was not a proximate cause of the damages; (3) that Atlas failed to cover the pipe at the northwest corner with cement stabilized sand; (4) but that such failure was not negligence; (5) nor was it the proximate cause of the damages to the electrical cables; (6) that prior to the break in the varsol line, Atlas failed to place fill under and around the northwest corner of the varsol line in question and tamp it by hand or mechanical device in layers six inches deep; (7) that such failure was negligence; (8) but that such negligence was not a proximate cause of the damages to the electrical system; (9) that Atlas's employee in backfilling the varsol trench filled same with a machine only without using a helper; (10) that such conduct was negligence; (11) but was not the proximate cause of the damages to the electrical system; (12) that Atlas's employee in backfilling the trench on the north side of the building failed to cover the varsol line with cement stabilized sand; (13) that such was negligence; (14) but such negligence was not a proximate cause of the damages; (15) that Atlas retained the right to control the method and details of the backfilling work done by Hildebrand who was employed by Atlas for the purpose of backfilling the varsol trench on the north side of the building; (16) that the use of a backhoe by Gulf to excavate the north side of the varsol trench was not negligence; (18) that Gulf's backhoe operator, in excavating the trench, failed to use a helper in the trench; (19) that such failure was negligence; (20) but that such negligence was not a proximate cause of the damages to the electrical system; (21) that Gulf compacted the fill by driving the tires of a front-end loader directly onto the fill over the varsol line; (22) that such compacting was not negligence; (24) that after LeBlanc became aware of the backhoe operation, LeBlanc permitted the backhoe work to continue; (25) that permitting the backhoe to operate in the trench was negligence; (26) but such negligence was not a proximate cause of the break in the line; (27) that LeBlanc did not fail to properly coordinate the work of the various contractors as would have been done by a person of ordinary prudence; (29) that Gulf's backhoe operations were not the sole proximate cause of the break in the varsol line; (30) that the architect authorized the use of stabilized sand as an alternative to the contract's specifications; (31) that LeBlanc did not fail to use stabilized sand in backfilling the west trench; (33) that LeBlanc did not do the backfilling in the trench where the varsol line broke; and (35) that the reasonable and necessary cost of repair and replacement, as a result of the damage to the electrical system, amounted to the sum of $26,532.00.

Under the first point of error, LeBlanc contends that the evidence, as a matter of law, shows Atlas breached its contract proximately causing the damages, and therefore the trial court should have disregarded the jury's adverse findings on proximate cause and should have entered a judgment non obstante veredicto for appellant.

Under this point, appellant takes the position that Atlas's subcontract had the effect of incorporating by reference the provisions of LeBlanc's prime contract wherein LeBlanc guaranteed to repair all damages caused by defects in the work for a period of one year; consequently Atlas breached the contract by refusing to live up to its agreement and since LeBlanc was required to make the repairs to the electrical system, it is entitled to reimbursement therefor in the amount of $26,532.00. Atlas, on the other hand, contends that the provisions of LeBlanc's prime contract guaranteeing the owner against *all* damages were not incorporated by reference and that under the terms of the subcontract, Atlas was obli-

gated to make good any defect in workmanship or material and any damages to the plumbing work as a result thereof.

The subcontract provided as follows:

"* * *

"The SUB–CONTRACTOR AGREES:

"* * *

"II. To be bound by the Contractor by the terms of the general conditions, drawings, specifications, addenda and alternates and to assume toward the Contractor all the obligations and responsibilities that the Contractor assumed in and by the aforesaid documents toward the Owner, *insofar as they are applicable to this Sub-Contractor.* (Emphasis supplied).

"* * *

"XI. To repair and make good any damages, defects, or faults in Sub-Contractor's work or materials, including materials or equipment covered by Manufacturer's guarantee, together with work of other trades disturbed or damaged as a result of such repairs, that may appear within one year, or longer if required by specifications, after date of final acceptance of the owners, Sub-Contractor shall also, within guarantee period, make any corrections or adjustments to meet specified performance results."

The prime contract between LeBlanc and Eastern contained these provisions:

Section 2–04, Special Conditions.

"Contractor hereby guarantees, for a period of one year from date of final acceptance, work called for in various divisions of specifications, when such work is performed by subcontractors. Where special guarantees are required of subcontractors, contractor shall secure warranties and deliver copies to Architect upon completion of work. Contractor warrants all work performed by him directly for a period of one year from date of final acceptance."

Article 24, General Conditions.

"Neither the final certificate, payment, nor any provisions in the contract documents shall relieve the Contractor from responsibility for negligence, faulty materials, or workmanship within one (1) year from date of final acceptance; and upon *written notice he shall remedy any* defects resulting therefrom. Therefore, the Contractor hereby guarantees for a period of one year from date of final acceptance work called for in the various Divisions of the specifications and on the drawings when such work is performed by sub-contractors. * * * Any question arising under this article may be resolved by the Architect's decision or by arbitration. Owner shall promptly advise the Contractor of observed defects."

Article 27, General Conditions.

"The Contractor shall protect each and every Contractor on the work against *damage caused by the Contractor* and shall indemnify and protect the Owner on account of any such damage; and if the Owner is sued on account thereof, the Contractor shall, at his expense, defend said suit and satisfy the costs incident to said suit and also any judgment which may be the result thereof." (Emphasis supplied).

Article 29, General Conditions.

"The Contractor shall at all times maintain adequate protection of all his work from damage and shall protect the Owner's and adjacent property from injury arising in connection with the Contractor's performance of this contract. He shall, at his own expense, remove and replace work damaged by his failure to provide protections required except such as may be directly due either to the act or omissions of the agents or employees of the Owner or to errors in the contract documents."

Section 63–44 of the plumbing specifications provided as follows:

"a. This Contractor shall and hereby does warrant, and the General Contractor shall and hereby does guarantee, that all work executed under this Division will be free from defects of materials and workmanship for a period of *one year* from the date of final acceptance, of this work.

"b. The above parties further agree that they will, at their own expense, repair and replace all such defective work, and all other work damaged thereby which becomes defective during the term of the Guarantee Warranty."

Upon completion of the work, LeBlanc demanded and received from Atlas a written warranty as follows:

"We further guarantee that we will, at our expense, repair and replace all such defective work, and all other work damaged thereby which becomes defective duiing the term of this guarantee, *except the work of others.*" (Emphasis supplied.)

■ The solution to the controversy will require a construction of the contract. No authorities are necessary to establish the well-known rule that an entire contract should be looked to in undertaking to interpret or construe a portion thereof. The whole contract may be considered as reflecting the general intentions of the parties which may give light upon the particular part of the contract that is in controversy.

It is significant, we think, to note that the last clause in Section II of the subcontract quoted above specifically provides that the provisions of the prime contract were to be incorporated in the subcontract only, "insofar as they are applicable to this Sub-Contractor." Thus, the clear inference is that the parties did not intend to incorporate all provisions of the prime contract. Our task is to determine which provisions, if any, of the prime contract did the parties intend to incorporate in the subcontract.

■ As we view the provisions of the prime contract as set forth in Section 2–04 and Sections 24 and 27, the parties never intended such provisions to be incorporated into the subcontract, because those provisions, by their own terms, were obviously meant to apply only to the general contractor. We likewise believe that the provisions of Article 29 were not intended to be incorporated into the subcontract. Any question, however, in connection with this provision is rendered immaterial because of appellant's failure to request and obtain any findings upon the question of whether the failure to protect the work proximately caused the damages. Rule 279, Texas Rules of Civil Procedure.

■ The remaining provision of the prime contract, which appellant contends was incorporated into the subcontract, is Section 63–44 of the plumbing specifications. Obviously the parties intended that this provision was to be incorporated and made a part of the subcontract. Consequently the liability of Atlas for damages, if any, must be determined upon the basis of the language used in the subcontract and the provisions of Section 63–44 incorporated therein by reference. The inquiry thus becomes a question of whether, as a matter of law, Atlas can be said to have breached the terms of its subcontract when same is construed together with the terms and conditions as set forth in Section 63–44. We have concluded that it did not.

■ An examination of the provisions of Paragraph XI of the subcontract shows that Atlas agreed only to repair defects or faults in its own work or materials and to make good the work of others which was damaged or disturbed while in the process of repairing its own defective work or materials. Under the provisions of Section 63–44, Atlas warranted that all work was to be free from defects in the material or workmanship for a period of one year, but

liability was limited to the repair of the defect and to the repair of any other plumbing work damaged by reason thereof. We fail to find anything in either the subcontract or Section 63–44 showing that Atlas agreed to repair any and all damages which might flow from defective workmanship or material or from other causes.

Moreover, we think the intent of the parties in this respect was made apparent by the terms of the separate warranty agreement which LeBlanc required of Atlas upon the completion of the work. The warranty specifically provided that Atlas was to repair its own work and any damages resulting to its own work, but further provided in the last sentence thereof that Atlas would not be responsible for any damages to the work of others.

Our conclusion is that Atlas did not breach the terms of the contract, because under the terms of the contract Atlas did not agree to repair all damage resulting from defective work or material.

Appellant further contends that if it is not entitled to damages for breach of contract as a matter of law, appellant is entitled to damages for breach of the contract based upon the jury's verdict finding that Atlas violated certain specifications of the plumbing contract, irrespective of the fact that the jury failed to find any of the violations proximately caused the damages. In this connection, appellant contends that a finding of causation was unnecessary, or if necessary, causation was shown as a matter of law and therefore the trial court erred in refusing appellant's motion for judgment notwithstanding the verdict. We think the contention is without merit.

■ It is fundamental in contract actions that there must be a causal connection between the alleged breach and the alleged damages resulting therefrom. As stated by the writer in 25 C.J.S. Damages § 18, p. 647–649:

"The legal concept of proximity is applicable to ascertain and measure damages. It may be stated as a broad general rule that a wrongdoer is liable to the person injured in compensatory damages for all of the natural and direct or proximate consequences of his wrongful act or omission, * * *"

In discussing damages under breach of contract, 17 Tex.Jur.2d 358–359 announces the same fundamental rule with regard to a charge to a jury:

"* * * The substance of the charge should be that if the jury find that the contract was breached as alleged in the petition, they should award to the plaintiff such damages as were the natural, direct, and proximate result of the breach and that were within the contemplation of the parties at the time of the making of the contract. * * *"

■ Since it is basic that there must be a causal connection established between the alleged breach of contract and the alleged damages resulting therefrom, it appears that LeBlanc either did not submit proximate cause issues with regard to breach of contract, which issues must be deemed to be found against it under Rule 279, T.R.C.P., or the proximate cause findings as submitted serve the dual purpose of proximate cause issues for both negligence and breach of contract which the jury determined against LeBlanc. Because of this basic failure to connect the violations of specifications to the break in the pipeline, appellant failed to sustain the burden of proof and therefore was not entitled to damages for breach of contract in this respect.

Under points two through eleven, appellant contends that it was entitled to judgment against Atlas notwithstanding the verdict upon the theory of negligence. As noted above, the jury found Atlas negligent in several respects, but failed to find such negligence to be a proximate cause of the damages. Appellant contends that the trial court erred in refusing to set aside the proximate cause issues and in rendering judgment for Atlas based upon such issues, as-

serting that the evidence was such that the court should have found proximate cause against Atlas as a matter of law, or in the alternative, that the jury's findings on proximate cause were contrary to the overwhelming weight and preponderance of the evidence.

It would serve no useful purpose to further review the more than 1,000 pages of testimony in the record. Every facet of the question of causation seems to have been fully explored. In some instances the witnesses were permitted to express an opinion as to what caused the break in the varsol line. For example, Mr. LeBlanc testified:

"My opinion is that the break was caused by a backhoe digging in the ditch, hitting the pipe or displacing the pipe, setting up a great leverage at the point of the riser as described, causing the bend as described by Mr. Waldrop, causing the break at the lower 'L' juncture of the rise and the 'L' at the lower level."

When asked for his reasons for this opinion, he further stated:

"A force to break a pipe like this would be more than a man stepping on the pipe. It would have to be a substantial blow. There is no question in my mind but what this pipe sustained a blow during the digging with the backhoe."

It is without dispute that there was no direct proof of how the pipe was broken, when it was broken, or who broke it.

■ It is fundamental in negligence cases that liability must be predicated upon a causal connection between the negligence alleged and the injury complained of, and the proof must be such as to establish causal connection beyond the point of conjecture. 40 Tex.Jur.2d 464; Bowles v. Bourdon, 148 Tex. 1, 219 S.W.2d 779, 13 A.L.R.2d 1; Thomas v. Beckering, (Tex.Civ.App.) 391 S.W.2d 771.

■ Where the evidence upon the question of causation is conflicting and circum-

stantial as it is in this instance, the issue of proximate cause is for the jury. Liberty Film Lines v. Porter, 136 Tex. 49, 146 S.W. 2d 982; Biggers v. Continental Bus System, Inc., supra.

■ Undoubtedly, facts might exist where the appellate court might be justified in concluding that proximate cause was established as a matter of law but such cases are rare indeed, and those in which the facts have been so interpreted make it clear that the facts must be such that reasonable minds could not arrive at a different conclusion. Liberty Film Lines v. Porter, supra; Cave v. Texas & Pacific Railway Company, (Tex.Civ.App.) 296 S.W.2d 558.

■ In our view, the record before us does not justify the conclusion that proximate cause was established as a matter of law. It is apparent, we think, that the evidence raised only a question of fact for the jury. The verdict makes it apparent that the jury felt that none of the acts or omissions alleged against Atlas proximately caused the damages to the electrical cables. Conceivably the jury believed that the break was caused by other contractors on the job or that some act or omission of Atlas not alleged against it proximately caused the damages. The assignments of error in this respect are accordingly overruled.

Nor are we able to agree with the contention that the jury's findings on proximate cause are against the overwhelming weight and preponderance of the evidence. Biggers v. Continental Bus System, Inc., supra.

Appellant makes no complaint of the findings by the jury exonerating Gulf from liability.

By points 12–15, appellant contends that the court erred in refusing its requested special issues by which appellant sought to have the cause submitted to the jury on the theory of res ipsa loquitur. Appellant requested a general issue of negligence against Atlas and also a similar but separate issue against Gulf, followed by the usual issues on proxi-

mate cause. In this connection, appellant argues that Atlas and Gulf, either jointly or in necessary rotation with each other, had exclusive control over the trench in which the varsol line lay and over all instrumentalities which could have come in contact with the line and that the break in the line was such that it would not have normally occurred in the absence of negligence. Therefore, appellant says the doctrine of res ipsa loquitur was applicable.

The law is well settled in Texas that in order for the doctrine of res ipsa loquitur to apply, it must be shown that the negligent cause or instrumentality which produced the injury was under the exclusive control or management of the defendant. Where the evidence shows that an accident may have happened as a result of two or more causes, and it is not more reasonably probable that it was due to the negligence of the defendant than to any other cause, the rule of res ipsa loquitur does not apply. Davis v. Castile, (Tex.Com.App.) 1924, 257 S.W. 870; Johnson v. Texas & Pac. Ry. Co., (Tex.Civ.App.) 117 S.W.2d 864; Worth Steel Corporation v. Gartman, (Tex.Civ.App.) 361 S.W.2d 426.

As we view the record, the trial court properly refused to submit the case upon the theory of res ipsa loquitur. The evidence shows that neither Atlas nor Gulf were on the construction project continuously after the line was laid and tested. In their absence, other contractors such as the sprinkler contractor, brick masons, the gas company and LeBlanc's own employees were working in and near the place where the line was broken. Moreover, as general contractor, LeBlanc had general control over the entire construction project. There was testimony by LeBlanc's superintendent that LeBlanc's own employees could have caused the break and other testimony by Mr. LeBlanc showing that Gulf could have caused the break. As we see it, the evidence not only fails to show exclusive control by either Atlas or Gulf, but shows that the accident could have happened as a result of one or two or more different causes. Furthermore, we do not believe the evidence shows joint control by Atlas and Gulf. In order to prove joint control, it must be shown that exclusive control of all instrumentalities which could have produced the damage was at all times in the defendants. Worden v. Union Gas System, 182 Kan. 686, 324 P.2d 501.

Appellant next contends that regardless of whether or not the doctrine of res ipsa loquitur was applicable, appellant was nevertheless entitled to have the case submitted upon the general issue of negligence as requested in that respect. We do not agree. It has long been the rule in this state that the submission of negligence generally without confining the issue to particular acts of negligence is reversible error. Roosth & Genecov Production Co. v. White, 152 Tex. 619, 262 S.W.2d 99; Clary v. Morgan Motor Co., (Tex.Civ.App.) 246 S.W.2d 936.

By the final point of error, appellant contends that there was an irreconcilable conflict between special issue No. 16 and special issues Nos. 24 and 25. The conflict, if any, appears to be immaterial, and in any event would not be fatal under the rule announced by the Supreme Court in Little Rock Furniture Mfg. Co. v. Dunn, 148 Tex. 197, 222 S.W.2d 985.

The judgment of the trial court is affirmed, and the appeal as to appellee, Muhl Electric Ltd. is dismissed.