C. V. RORIE, Jr., et al., Appellants,

v.

CITY OF GALVESTON, Appellee.

No. 205.

Court of Civil Appeals of Texas, Houston (14th Dist.).

June 10, 1970.

Rehearing Denied July 8, 1970.

Arthur J. Mandell, Mandell & Wright, Dixie Smith, Fulbright, Crooker, Freeman, Bates & Jaworski, Theodore Goller, Eikel & Goller, Houston, Bryan F. Williams, Jr., Royston, Rayzor & Cook, Galveston, for appellants.

V. W. McLeod, McLeod, Alexander, Powel & Apffel, Galveston, for appellee.

SAM D. JOHNSON, Justice.

C. V. Rorie, Jr., a longshoreman, brought this suit to recover damages for personal injuries sustained while working on board the ship SS Armagh in Galveston, Texas, on September 6, 1960. He named as defendants the City of Galveston, hereinafter sometimes called City, and Avenue Shipping Co., Ltd., and Trinder, Anderson & Co., Ltd., the owners and operators of the ship SS Armagh, hereinafter collectively called shipowner.

Strachan Shipping Company was the stevedoring company and Rorie's employer. Strachan was impleaded by the cross-action of the City. Subsequently, the shipowner also filed a cross-action against Strachan seeking indemnity for any sums it might be required to pay to Rorie as a consequence of his suit. Strachan counterclaimed against both defendants. Strachan's workmen's compensation insurance carrier, Texas Employers' Insurance Association, intervened to recover the compensation and medical payments made to Rorie as a consequence of his injuries on the ship.

Rorie's suit was dismissed for want of prosecution by the District Court on July 12, 1966. This judgment was reversed by the Court of Civil Appeals for the First Supreme Judicial District of Texas, and the case remanded to the District Court for trial on the merits. See: Rorie v. Avenue Shipping Co., Ltd., 414 S.W.2d 948, ref., n. r. e.

After remand the case proceeded to trial before a jury in 1968. The jury's verdict found the City's employee at fault for Rorie's damages and granted Rorie recovery of damages in the sum of $75,000 from the City. It exonerated the shipowner from any liability to Rorie for unseaworthiness or negligence. It further exonerated Strachan from any liability on the cross-actions of the City and the shipowner.

The trial court granted the motion of the City for judgment notwithstanding the verdict and entered a final judgment that Rorie take nothing from the defendants below, the City and the shipowner, and that the shipowner recover from Strachan the sum of $7,500.00 for attorney's fees and disbursements incurred in the successful defense of Rorie's suit. All other relief was denied.

With the exception of the City, all parties have appealed.

It is to be noted that judgment in the instant case was signed and entered on August 26, 1968, and that two days thereafter a letter was sent to the official court reporter of the trial court requesting preparation of the statements of facts. By affidavit of the court reporter it appears that such work was not even begun until September 15, 1969, over twelve months after trial. The statement of facts was filed in this Court on January 6, 1970, over a year and four months following the initial request therefor. During this period this Court has been presented with no less than eight sworn motions by the court reporter requesting extensions of time. Such delay on the part of the court reporter (solely responsible to the judge of the trial court) is a major reason that

this case comes before this Court for determination almost ten years after the date of the accident.

The SS Armagh, a deep-sea cargo vessel on board which the appellant, C. V. Rorie, Jr., was injured, was docked in the Port of Galveston for the purpose of discharging a cargo of bulk ore. Strachan, a stevedoring company with offices in Galveston, was engaged by the shipowner to provide the necessary longshoremen and equipment to discharge the Armagh's cargo.

To discharge the bulk ore, Strachan arranged for the use of a land-based mobile railway crane sometimes hereafter referred to as the Brown Hoist crane, which was owned by the City. The Brown Hoist crane operated on railroad tracks on the wharf adjacent to the pier where the SS Armagh was moored. The evidence is undisputed that the City furnished the Brown Hoist crane, its operator, Frank McPeters, and a helper, Herman Ermis. McPeters, the operator of the Brown Hoist crane at the time of the accident, was shown to be deceased at the time of trial. A supervisor employed by the City, Johnnie Johnston, was also present on the wharf.

The five longshoremen in Rorie's gang were discharging a cargo of ore from the ship. Rorie was assigned to work in the hold. W. L. Patterson was the signalman. Herman Weber, the gang foreman who died prior to commencement of this trial, operated the ship's winch. The remaining two longshoremen were assigned to work on the rail cars on the dock.

At the time of the accident ore was being discharged from the lower hold of the No. 5 hatch. Running lengthway with the ship down the center of this particular hold was a stanchion or metal structure about four feet wide and seven feet high. This structure extended from the engine room to the stern of the ship to cover the vessel's propellor shaft.

In normal procedure the ore was scooped out of the ship's hold by a clamshell bucket attached by cables to the Brown Hoist crane and emptied into rail cars positioned on the track on the pier adjacent to the ship. After emptying, the operator of the Brown Hoist crane would swing the empty clamshell bucket back over the ship's open hatchway and upon receipt of a signal from the flagman, Patterson, would lower it onto the hold alongside the stanchion which protects the propellor shaft. On the flagman's signal the operator of the Brown Hoist crane would stop the clamshell bucket about one to two feet above the deck. The Brown Hoist crane operator would then, again on the flagman's signal, move the clamshell bucket to the nearest permissible proximity of the ore to be scooped up.

To drag the clamshell bucket under the overhead deck to the ore piled against the side of the ship a cable had been rigged from the ship's winch through two blocks. These blocks were positioned so that the clamshell bucket, after it had been stopped above the deck in the hatchway, could be pulled into position by use of the cable attached to the ship's winch. Rorie, who was working on the top of the ore in the lower hold, would take a hook attached to the end of the cable which ran from the ship's winch and carry it to the edge of the hatchway and attach it to the clamshell bucket. Then, upon a signal from the signalman, Patterson, the operator of the ship's winch would pull the clamshell bucket back into the wing of the hold and on top of the cargo. The bucket would then, again on signal from the signalman, be opened by the operator of the Brown Hoist crane and dropped on the ore. The hook attached to the cable from the ship's winch would next be detached from the clamshell bucket by Rorie. The operator of the shore-based Brown Hoist crane would then on signal from Patterson pull the clamshell bucket toward the center of the vessel, into the hatchway, and this movement of the open bucket would fill it as it moved through the ore.

Finally, after the clamshell bucket had cleared and reached the open hatchway, the Brown Hoist crane operator would, on signal from the signalman, hoist the bucket out of the hold and empty the ore into the railway car on the dock.

The record indicates that immediately prior to Rorie's injury the Brown Hoist crane operator swung the clamshell bucket over the main deck hatchway of the No. 5 hold, and in response to Patterson's signal, the clamshell bucket was being lowered into the hold. There are two versions of what next transpired. Patterson, the signalman, testified that the clamshell bucket was lowered completely into the lower hold and was stopped in its usual position two or three feet above the deck. Then without any signal on his part, the bucket suddenly and rapidly swung backward toward the stern of the ship and then forward where it hit the stanchion ladder and the stanchion in the middle of the hold, then ricocheted and hit the cargo ore, then ricocheted again hitting and pinning Rorie under it. This version of the accident is at variance with that testified to by Rorie, the plaintiff. It was Rorie's testimony that he was back in the wing of the hold looking in the direction the clamshell bucket was to descend. He testified the first thing he saw was "the bucket hit the ladder and upright center-line stanchion just below the 'tween-deck, and fire just flew." The plaintiff's testimony was quite clear that the clamshell bucket had not fully descended into the lower hold where he was stationed and that if it had he would have seen it. Rorie proceeded to testify that it was while the clam shell bucket was being lowered down into the hold that it struck the stanchion ladder and ricocheted on to him causing his injuries. According to Rorie's testimony this occurred suddenly and unexpectantly. Under either version it appears that at the time Rorie was injured neither the cable from the ship's winch nor any other ship's equipment was attached to the clamshell bucket or in any manner involved in the accident. It further appears that at the time the clamshell bucket hit Rorie he was climbing on a sweat batten (a timber which protects the metal skin of the ship) trying to get out of the way. It does not appear to be disputed but that the operation of the Brown Hoist crane caused serious and permanent injuries to Rorie.

The jury found that McPeters, the Brown Hoist crane operator, struck the clamshell bucket against the ladder in the No. 5 lower hold (special issue no. 11), that such act was negligence (special issue no. 12), and a proximate cause of Rorie's injuries (special issue no. 13). The jury also found that the stevedoring company, Strachan, did not have the right to direct and control McPeters in the operation of the Brown Hoist crane (special issue no. 18) and that McPeters, the operator of the Brown Hoist crane, was not a loaned employee of Strachan (special issue no. 25). In rendering judgment non obstante veredicto for the City, the trial court disregarded the jury's answers to special issues nos. 18 and 25.

■ A trial court may not disregard the jury's findings of fact and enter judgment non obstante veredicto unless there is no evidence of probative value upon which the jury could have relied in making its determination of fact. In considering such a motion all testimony must be considered in the light most favorable to the party against whom the motion is sought and every reasonable intendment deducible from the evidence is to be indulged in such party's favor. Leyva v. Pacheco, 163 Tex. 638, 358 S.W.2d 547, 550 (Sup.Ct.1962); Lynch v. Ricketts, 158 Tex. 487, 314 S.W.2d 273, 276 (Sup.Ct.1958); Burt v. Lochausen, 151 Tex. 289, 249 S.W.2d 194, 199 (Sup.Ct.1952).

■ There is no dispute that McPeters, the operator of the Brown Hoist crane, was a general employee of the City of Galveston. In addition, McPeters had been in the City's employ for many years and was trained by the City for this particular

work. The City paid McPeters' salary and deducted from it retirement, contributions, and income taxes. The City provided McPeters pension and welfare benefits. The City had employed McPeters initially and had the sole right to discharge him. A witness called by the City and familiar with the practice testified that he had never seen a longshoreman operate a City crane and that he would not let a longshoreman operate one. Neither McPeters nor any other crane operator would subject himself to the control of a stevedoring company in the operation of the City's cranes. The City's crane was an expensive and complicated piece of machinery which could not be repaired by anyone other than the City. The crane's value was estimated at between $75,000 and $100,000. We believe the record to be clear that any use of the City's crane could only be with the operator furnished by the City and that the user had no right to control the City's operator in the operation of the crane.

Despite the record of these facts and findings of the jury (special issues 18 and 25), the trial court granted the City's motion for judgment non obstante veredicto. Apparently, and the City so contends, the trial court granted the motion for judgment non obstante veredicto on the basis of a "tariff" promulgated by the City, and which provided in No. 4–B, item 97, as follows:

"It is hereby understood and agreed that in the event lessee uses the operator of said unit employed by the Galveston Wharves, such operator shall be under the direction of the lessee and the operator shall be considered as the agent or servant of the lessee and lessee shall be responsible for the acts of such operator during the time of rental or lease."

It is the City's position that the foregoing provision in the tariff is determinative of the loaned servant question.

■ We hold that the jury's answers were fully supported by the evidence and that the judgment non obstante veredicto was erroneously entered. See Insurors Indemnity & Insurance Co. v. Pridgen, 223 S.W.2d 217 (Sup.Ct.1949); Goodwin v. Wilhelm Steel Const. Co., Tex.Civ.App., 311 S.W.2d 510, err. ref.; Polanco v. Austin Bridge Co., Tex.Civ.App., 348 S.W.2d 728, no writ hist. A general employee of one person will not become the loaned servant of another where the evidence shows the right of control was in fact retained by the general employer. Humble Oil & Refining Co. v. Martin, 148 Tex. 175, 222 S.W.2d 995 (Sup.Ct.1949); Halliburton Oil Well Cementing Co. v. Paulk, 180 F.2d 79 (5th Cir. 1950).

■ We further conclude that the tariff in question does not avail the City. Title 46, U.S.C.A., Sec. 814 et seq., (the shipping act) provides, "All agreements, modifications, or cancellations made after the organization of the Board shall be lawful only when and as long as approved by the Board. * * *" There is no evidence in the instant record that the tariff was approved by the Federal Maritime Commission upon which it necessarily depended for viability. Port of Tacoma v. S. S. Duval, 9 Cir., 364 F.2d 615; Greater Baton Rouge Port Commission v. United States, 287 F.2d 86 (5th Cir. 1961); Volkswagenwerk Aktiengesellschaft v. Federal Maritime Commission, 390 U.S. 261, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968). The record gives no indication that the tariff was agreed to by the parties or that it was ever received by Strachan. Absent, therefore, the required approval by the Maritime Commission the tariff appears to be no more than a unilateral declaration of the City. Appellant's points of error relating to the trial court's granting the motion for judgment non obstante veredicto are sustained.

The City of Galveston submits cross-points of error contending that the cause should be remanded rather than rendered if the trial court's judgment is not affirmed. The first two cross-points contend that special issues nos. 12 and 13 were global and that the court should have submitted

specific issues of negligence. The pertinent special issues and the answers thereto are as follows:

"SPECIAL ISSUE NO. 11

"Do you find from a preponderance of the evidence that, at the time and on the occasion made the basis of this suit, in the operation of the Brown hoist No. 8, the operator of said hoist struck the clam-bucket attached to such hoist against the ladder in the lower hold of No. 5 hatch?

"Answer 'We do' or 'We do not.'

"Answer: We do

"If you have answered Special Issue No. 11 'We do,' and only in that event, then answer:

"SPECIAL ISSUE NO. 12

"Do you find from a preponderance of the evidence that the operator of the Brown hoist No. 8, in striking the clam-bucket attached to such hoist against the ladder in the lower hold of No. 5 hatch, failed to exercise ordinary care in the operation of said hoist?

"Answer 'We do' or 'We do not.'

"By the term 'ordinary care,' as used in this charge, is meant that degree of care that an ordinarily prudent person would use under the same or similar circumstances.'

"Answer: We do.

"If you have answered Special Issue No. 12 'We do,' and only in that event, then answer:

"SPECIAL ISSUE NO. 13

"Do you find from a preponderance of the evidence that such failure, if any, was a proximate cause of Plaintiff's injuries?

"Answer 'We do' or 'We do not.'

"Answer: We do"

Timely and proper objection was made by the City (to special issue no. 12 and 13) on the grounds that they amounted to a global submission and because they constituted a general charge rather than an inquiry on specific acts of negligence. The City contends that specific issues of negligence must be submitted to and passed upon favorably by the jury in order to sustain a judgment, citing Kainer v. Walker, 377 S.W.2d 613 (Sup.Ct.1964); Roosth & Genecov Production Co. v. White, 152 Tex. 619, 262 S.W.2d 99 (Sup.Ct.1953); Driver v. Worth Construction Co., 154 Tex. 66, 273 S.W.2d 603 (Sup.Ct.1954); Barclay v. C. C. Pitts Sand & Gravel Co., 387 S.W.2d 644 (Sup.Ct.1965); Jack Cane Corporation v. Gonzales, Tex.Civ.App., 410 S.W.2d 953, no writ hist.; Simmons Motor Co. v. Mosley, Tex.Civ.App., 379 S.W.2d 711, ref., n. r. e.; Louisiana & Arkansas Ry. Co. v. Carpenter, Tex.Civ.App., 402 S.W.2d 198; Thomas v. Shut, Tex.Civ.App., 448 S.W.2d 536; and LeBlanc, Inc. v. Gulf Bitulithic Co., Tex.Civ.App., 412 S.W.2d 86, ref., n. r. e.

■ In response, the plaintiff makes what will be considered alternative contentions. First, plaintiff contends it was undisputed that the operator of the Brown Hoist crane had the exclusive control of the operation of the hoist so that the res ipsa loquitur doctrine is applicable. We cannot agree. As we view the instant record "exclusive control" on the part of the operator (McPeters) was indeed disputed throughout the entire record. We believe it to be apparent that at the time and on the occasion in question McPeters' operation of the Brown Hoist crane was dependent upon signals being given by the signalman, Patterson, who was an employee of Strachan. McPeters was at the controls of the Brown Hoist crane but was positioned so that he could not see down into the hold of the ship, could not see the stanchion ladder or the stanchion, and could not see Rorie. By virtue of the operator's inability to see into the hold the use of a signalman was essential to the Brown Hoist crane's opera-

tion of the clamshell bucket. The clamshell bucket was made of iron, was estimated to weigh in the neighborhood of four thousand pounds, was moved a considerable distance both vertically and horizontally, and was used in a reasonably close proximity to the various individuals heretofore indicated. We believe it to be inescapable that no operation or movement of the clamshell bucket would be made where the operator of the Brown Hoist crane could not observe its position or had the assistance of a signalman so as to be enabled to determine its position. A part of the signalman's responsibility was to see that the man in the hold was safely positioned in relation to the movement of the bucket. It is apparent that assistance in the form of signals and directions from the signalman, Patterson, were indispensible to the operation of the Brown Hoist crane when it was in the hold or was descending into the hold. This being true we must conclude that no exclusive control by McPeters, the Brown Hoist crane operator, is indicated in this record. This is true under either version of how the accident occurred.

■ Such record is dissimilar from that in Bond v. Otis Elevator Co., 388 S.W.2d 681 (Sup.Ct.1965), relied upon by the plaintiff. Aside from the patent factual dissimilarity the instant case contains no jury finding of exclusive control. In Bond, supra, the jury found exclusive control in one of the defendants, Adolphus Tower Building. (Court of Civil Appeals opinion, Otis Elevator Co. v. Bond, 373 S.W.2d 518). The Supreme Court stated, " * * * the evidence *shows conclusively* that Otis was in control of the elevator jointly with (a co-defendant) Adolphus Tower. * * * " (Emphasis added). Bond v. Otis Elevator Co., supra, at p. 686. For the doctrine to be invoked it must be shown that the instrumentality by which the harm was occasioned was in the exclusive control of the defendant. As our Supreme Court has recently stated, "As a matter of law, this is not a *res ipsa loquitur* case. The record shows conclusively that the instrumentality

causing the harm was not under the *exclusive control* of Brown or his employer Hughes." (2nd emphasis added). Owen v. Brown, 447 S.W.2d 883, 886 (Sup.Ct. 1969). See also City of San Antonio v. Esquivel, 163 Tex. 222, 353 S.W.2d 410 (Sup.Ct.1962); Honea v. Coca Cola Bottling Co., 143 Tex. 272, 183 S.W.2d 968 (Sup. Ct.1944).

■ In what is considered an alternative contention the plaintiff asserts that the issues are sufficiently specific and do not constitute a global submission. Special issue no. 11 inquired whether or not the operator of the Brown Hoist crane struck the clamshell bucket against the ladder in the hold. An affirmative answer to this issue *does* appear to have been conclusively established in the record. Special issues 12 and 13, however, inquire whether or not the operator failed to exercise ordinary care, and contingently, if such failure was a proximate cause of plaintiff's injuries. It is first to be noted that five specific acts of negligence on the part of the City were pled by the plaintiff; such specific pleading preceding the plaintiff's pleading on the basis of res ipsa loquitur. It is again also noted that timely and proper objections to these last two special issues were urged by the City. The possible alternative which might arise in the absence of proper and timely objection suggested by Justice Walker in Barclay v. C. C. Pitts Sand & Gravel Co., supra, do not exist here. The instant case is one on which reliance is placed on an "ordinary care" issue devoid of any such assistance and standing on the fact situation described. "It is nevertheless well settled that as a general rule and when the question is properly raised, special issues relating to either primary or contributory negligence should be restricted to specific acts and omissions which have been raised by the pleadings and evidence." Barclay v. C. C. Pitts Sand & Gravel Co., supra, 387 S.W.2d at p. 647. We must conclude that the "proper control" issue condemned in Barclay, supra, and the "ordinary care" issue condemned in Kainer,

supra, are no more specific than the issues here used. The City's cross-points of error must be sustained.

By virtue of this determination it is incumbent upon this Court to reverse and remand the instant case to the trial court. This being true we do not reach Strachan's points of error grounded in the trial court's award of recovery to the shipowners of attorneys' fees and disbursements incurred in the defense of plaintiff's suit against the shipowners. Neither do we reach the contention of plaintiff's counsel that a reasonable attorney's fee should be awarded him out of the reimbursement awarded by the trial court to Texas Employers Insurance Association, intervenors herein, for the medical expenses and compensation insurance benefits paid to plaintiff.

In view of the disposition here made of the instant case, it is to be noted that the City in cross-points of error numbers 3, 4 and 5, contends that the trial court should have submitted the City's requested issues as to the alleged negligence of the plaintiff Rorie in failing to position himself safely with respect to the clamshell bucket. The facts evident in the instant record show, however, that the plaintiff had to be within a relatively close proximity of the bucket in order to fulfill his tasks as a workman. Under such circumstances the possibility that Rorie could have stationed himself somewhere in the ship's hold that was further removed from the clamshell bucket does not raise an issue as to negligence on his part in failing to do so. These cross-points of error are overruled.

For the reasons heretofore stated, this case is reversed and remanded.

BARRON, Justice (dissenting).

While I agree with the opinion of the majority generally, I cannot agree that this cause should be reversed and remanded because special issues numbers 12 and 13 are alleged to be global.

I would hold that the above special issues are sufficiently specific under the peculiar facts of this case. I do not consider cases such as Barclay v. C. C. Pitts Sand & Gravel Co., 387 S.W.2d 644, 647 (Tex. Sup.), and similar authority to be here applicable or controlling.