C. V. RORIE, Jr., et al., Petitioners,

v.

CITY OF GALVESTON, Respondent.

No. B–2326.

Supreme Court of Texas.

July 28, 1971.

Rehearing Denied Oct. 13, 1971.

Eikel & Goller, Robert Eikel and Theodore Goller, Fulbright, Crooker, Freeman, Bates & Jaworski, Dixie Smith, Houston, Mandell & Wright, Arthur J. Mandell, Houston, Royston, Rayzor & Cook, Bryan F. Williams, Jr., Galveston, for petitioners.

McLeod, Alexander, Powel and Apffel, V. W. McLeod and Ben R. Powel, Galveston, for respondent.

WALKER, Justice.

This suit was brought by C. V. Rorie, Jr., a longshoreman, to recover for personal injuries sustained while working on board the S. S. Armagh in Galveston. On the controlling question presented by the appeal, we hold that the hoist operator whose negligence caused plaintiff's injuries was, as a matter of law, the borrowed servant of plaintiff's employer.

Plaintiff sought a recovery against Avenue Shipping Co., Ltd., and Trinder, Anderson & Co., Ltd., the owners and operators of the ship, hereinafter referred to collectively as the shipowner, and the City of Galveston, operator of the terminal facilities known as Galveston Wharves. Strachan Shipping Company which was the stevedoring company and Rorie's employer, was impleaded by cross-action of the City. The shipowner also filed a cross-action against Strachan, seeking indemnity for any sums it might be required to pay Rorie and a recovery of attorney's fees and other expenses incurred in defense of the suit. Strachan in turn sought judgment over against the City and the shipowner in the event any judgment was rendered against it. Texas Employers' Insurance Association, Strachan's compensation insurance carrier, intervened to recover the compensation and medical benefits paid to Rorie.

The S. S. Armagh was docked in the Port of Galveston for the purpose of discharging a cargo of bulk ore, and Strachan was employed by the shipowner to discharge the cargo. Rorie was one of the longshoremen employed by Strachan to assist in the operation. Strachan arranged to and did use a land-based mobile railway crane, sometimes referred to as a Brown hoist, owned by the City. The ore was scooped out of the ship's hold and transferred into railroad cars on the wharf with a clamshell bucket attached by cables to the hoist. Frank McPeters was the operator of the hoist, and he was assisted by a helper, Herman Ermis, who stayed on the wharf. Both McPeters and Ermis were in the general employ of the City. A flagman employed by Strachan was stationed on the deck of the vessel and gave signals to the crane operator, who was unable to see into the ship's hold.

Rorie was working in the lower hold at the time he was injured. A metal structure about four feet wide and seven feet high, referred to as a stanchion, extended through the center of the hold. On the occasion in question, the bucket struck the stanchion ladder either while it was being lowered into the hold or when it was swung suddenly and violently after being lowered into the hold. The bucket ricocheted off the ladder and struck Rorie, thereby causing his injuries.

The jury: (1) refused to find the vessel unseaworthy or the shipowner negligent; (2) found in response to Special Issues Nos. 12 and 13 that plaintiff's injuries were proximately caused by the failure of the hoist operator to exercise ordinary care in its operation; (3) refused to find that the plaintiff was negligent; and (4) in response to Special Issues Nos. 18 and 25 refused to find that Strachan had the right to direct and control McPeters in the operation of the hoist, and found that McPeters was not a loaned employee of Strachan. The trial court concluded that McPeters was the loaned employee of Strachan as a matter of law. It accordingly granted the City's motion to disregard the jury's findings in response to Special Issues Nos.

18 and 25. Judgment was rendered that plaintiff take nothing and that the ship-owner recover against Strachan the cost of defending the suit in the amount of $7,500.00.

The Court of Civil Appeals reversed the judgment of the trial court and remanded the cause for a new trial, holding: (1) that the jury's answers to Special Issues Nos. 18 and 25 are supported by the evidence, and (2) that Special Issues Nos. 12 and 13, upon which Rorie must rely to support any judgment in his favor, constitute an improper global submission. 456 S.W.2d 421. All parties filed applications for writs of error, and all applications were granted. We reverse the judgment of the Court of Civil Appeals and affirm that of the trial court.

■ It is settled, of course, that a general employee of one person may become the special or borrowed employee of another employer. As we pointed out in Producers Chemical Co. v. McKay, Tex.Sup., 366 S.W. 2d 220:

"Whether general employees of one employer have, in a given situation, become special or borrowed employees of another employer is often a difficult question, particularly when employees are furnished with machinery by their general employer to accomplish part of a project or contract undertaken by another. Solution of the question rests in right of control of the manner in which the employees perform the services necessary to accomplishment of their ultimate obligation. If the general employees of one employer are placed under control of another employer in the manner of performing their services, they become his special or borrowed employees. If the employees remain under control of their general employer in the manner of performing their services, they remain employees of the general employer and he is liable for the consequences of their negligence.

*   *   *   *   *   *

"When a contract, written or oral, between two employers expressly provides that one or the other shall have right of control, solution of the question is relatively simple.   *   *   *"

The two employers in this case did, in effect, expressly agree that Strachan would have the right to control the hoist and its operator. The lease of the hoist is governed by Galveston Wharves Tariff Circular No. 4–B, which was published and filed with the Federal Maritime Commission on January 1, 1960. A copy was also sent to various shipping interests, including Strachan. The following provisions of the tariff are relevant here:

"When cranes, derricks, hoists, conveyors, lift trucks, trucks, tractors, etc. are rented or leased to others, it is expressly understood that the unit will be operated under the direction and control of the lessee and the lessee shall be responsible for the operation thereof, and the lessee assumes all risk for injuries or damages which may arise or grow out of the use or operation of said unit.

"It is hereby understood and agreed that in the event lessee uses the operator of said unit employed by the Galveston Wharves, such operator shall be under the direction of the lessee and the operator shall be considered as the agent or servant of the lessee and lessee shall be responsible for the acts of such operator during the time of rental or lease. It is incumbent upon the lessee to make a thorough inspection and satisfy himself as to the physical condition and capacity of the unit, as well as the competency of the operator, there being no representation or warranties with reference to such matters."

■ Although filed with the Federal Maritime Commission, the tariff has not been formally approved by the Commission. Rorie argues, and the Court of Civil Ap-

peals held, that the tariff is an understanding or agreement that is required to be approved by the Commission under Section 15 of the Shipping Act, 1916, as amended. 46 U.S.C.A. § 814. We do not agree. The types of agreements or understandings that must be approved by the Commission are set out in the statute which, at all times relevant here, provided as follows:

"Every common carrier by water, or other person subject to this chapter, shall file immediately with the Federal Maritime Board [now Federal Maritime Commission] a true copy, or, if oral, a true and complete memorandum, of every agreement, with another such carrier or other person subject to this chapter, or modification or cancellation thereof, to which it may be a party or conform in whole or in part, fixing or regulating transportation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; controlling, regulating, preventing, or destroying competition; pooling or apportioning earnings, losses, or traffic; allotting ports or restricting or otherwise regulating the number and character of sailings between ports; limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; or in any manner providing for an exclusive, preferential, or cooperative working arrangement. The term 'agreement' in this section includes understandings, conferences, and other arrangements.

\*　\*　\*　\*　\*　\*

"All agreements, modifications, or cancellations made after the organization of the Board shall be lawful only when and as long as approved by the Board, and before approval or after disapproval it shall be unlawful to carry out in whole or in part, directly or indirectly, any such agreement, modification, or cancellation."

The statute by its terms thus applies only to agreements: (1) fixing or regulating transportation rates or fares; (2) giving or receiving special rates, accommodations or other special privileges or advantages; (3) controlling, regulating, preventing or destroying competition; (4) pooling or apportioning earnings, losses or traffic; (5) allotting ports or restricting or otherwise regulating the number and character of sailings between ports; (6) limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; or (7) in any manner providing for an exclusive, preferential or cooperative working arrangement. The tariff in question, which is unilaterally promulgated and uniformly applicable to all who lease equipment from the terminal operator, does not fit any of the categories specified in the statute and in our opinion is not governed by its provisions. This is the view of the Commission, which has filed an amicus curiae brief expressing the opinion that the tariff of a terminal operator furnishing services in connection with common carriers by water becomes effective upon filing.

There is another reason, if one were required, for concluding that the tariff is effective as between Strachan and the City even though it was not approved by the Commission. The statute applies only to an agreement made by a common carrier by water or other person subject to the chapter "with another such carrier or other person subject to this chapter." The term "other person subject to this chapter" is defined as meaning any person not included in the term "common carrier by water" carrying on the business of forwarding or furnishing wharfage, dock, warehouse or other terminal facilities in connection with a common carrier by water. 46 U.S.C.A. § 801. Although the City's activities clearly bring it within this definition, there is nothing to suggest that Strachan is either a common carrier by water or "other person subject to this chapter" within the meaning of the statute.

Rorie cites a number of cases dealing with agreements falling into one or more of the categories specified in the statute. See Volkswagenwerk Aktiengesellschaft v.

Federal Maritime Com., 390 U.S. 261, 88 S.Ct. 929, 19 L.Ed.2d 1090; Port of Boston Marine Ter. Ass'n v. Boston Shipping Ass'n, 1st Cir., 420 F.2d 419, reversed, Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Trans-Atlantic, 400 U.S. 62, 91 S.Ct. 203, 27 L.Ed.2d 203; Matson Navigation Co. v. Federal Maritime Com., 9th Cir., 405 F.2d 796; Greater Baton Rouge Port Com. v. United States, 5th Cir., 287 F.2d 86; Anglo Canadian Shipping Co. v. United States, 9th Cir., 264 F.2d 405; River Plate & Brazil Conf. v. Pressed Steel Car Co., 2nd Cir., 227 F.2d 60. None of these decisions affords any basis for holding that a tariff published and filed by a terminal operator can have no effect until approved by the Commission. Rorie also suggests that the tariff in this case is comparable to the municipal charter and ordinance considered in National Bank of North America v. S.S. Oceanic Ondine, S.D.Tex., 315 F.Supp. 386. If he is correct in that respect, we simply do not agree with the second and alternative holding stated by the court in support of the judgment rendered in that case.

■ Rorie further contends that there is evidence to support the conclusion that Strachan did not have the right to control the hoist operator as provided in the tariff. The circumstances upon which he relies will be stated briefly. The hoist was owned and maintained by the City, and the operator was employed and paid by the City. Anyone leasing the hoist was required to use an operator furnished by the City. The hoist remained on the wharf, which was owned by the City, and Strachan was charged for its use on a tonnage rather than an hourly basis.

The City employed a supervisor of the hoist operators. This supervisor made a practice of observing the operations of the different hoists, and he would talk with the operator if he found "something that you don't operate just right." The supervisor was sitting in his automobile and watching the unloading of the S.S. Armagh at the time of the accident. There is also testimony that the stevedoring company does not attempt to direct the operator in his handling of the levers and controls of the hoist.

The hoist was an expensive and complicated piece of equipment and required an experienced operator. In the absence of an express agreement dealing with the right of control, this circumstance tends to support an inference that the owner of the equipment intended for his employees to protect the same and not submit to the control of an inexperienced special employer. See J. A. Robinson Sons, Inc. v. Wigart, Tex.Sup., 431 S.W.2d 327. It has little probative significance, however, when the parties have expressly agreed that the equipment and its operator will be under the control of the special employer. There is no evidence here that the City had ever interfered with a lessee's right to control the equipment and its operator, and it does not appear that the supervisor or any other representative of the City attempted to exercise any control over the manner in which McPeters operated the hoist in unloading the vessel for Strachan. In our opinion the evidence in this case will not support the conclusion that, despite the provisions of the tariff, McPeters remained under the City's control in his operation of the hoist on the occasion in question.

■ The tariff provisions quoted above are binding upon the City and upon all persons dealing with it. They entered into and became part of the lease agreement between the City and Strachan. See Texas City Ter. Ry. Co. v. American Equit. Assur. Co., S.D.Tex., 130 F.Supp. 843, and authorities there cited. We thus have an agreement expressly vesting the right of control in Strachan, and there is no evidence that the City retained any right of control. In these circumstances the tariff is conclusive, and McPeters was the loaned employee of Strachan as a matter of law. Magnolia Petroleum Co. v. Francis, Tex.Civ.App., 169 S.W.2d 286 (wr. ref.); Steele v. Wells,

Tex.Civ.App., 134 S.W.2d 377 (wr. ref.); Southern S.S. Co. v. Meyners, 5th Cir., 110 F.2d 376.

 Rorie is correct in saying that Galveston Wharves has, for some purposes, the status of a common carrier by railroad. See Galveston Wharf Co. v. Galveston, H. & S. A. R. Co., 285 U.S. 127, 52 S.Ct. 342, 76 L. Ed. 659; United Industrial Workers, etc. v. Board of Trustees, etc., 5th Cir., 351 F.2d 183. It appears to us, however, that this is not material here. We recognize the general rule that a common carrier cannot stipulate for immunity from its own negligence. See United States v. Atlantic Mut. Ins. Co., 343 U.S. 236, 72 S.Ct. 666, 96 L.Ed. 907; Boston & M. R. Co. v. Piper, 246 U.S. 439, 38 S.Ct. 354, 62 L.Ed. 820. The tariff provisions now in question deal with the right to control operators of equipment leased from the City. They do not attempt to limit the responsibility of the City for its own fault or negligence, and they could expose the City to liability for injuries sustained by the operator of its equipment. See 33 U.S.C.A. § 905; Art. 8306, Sec. 3a, Vernon's Ann.Tex.Civ.Stat.; Process Engineering Co. of Ft. Worth v. Rosson, Tex. Civ.App., 287 S.W.2d 511 (no writ); Stroud v. Zuzich, Mo., 271 S.W.2d 549; Simmons v. Kansas City Jockey Club, 334 Mo. 99, 66 S.W.2d 119. In our opinion the tariff does not constitute an attempt by the City to limit its liability in contravention of the rule mentioned above.

Strachan contended in the Court of Civil Appeals and insists here that the trial court erred in awarding the shipowner a recovery against it for the expense of defending the suit. Strachan's liability in this respect arises from a breach of the implied warranty of workmanlike service. See Ryan Stevedoring Co. v. Pan Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133. Where breach of the warranty is raised but not conclusively shown by the evidence, the shipowner has the burden of establishing a breach by obtaining findings that the stevedore failed to do the work

properly or safely. See Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 369 U.S. 355, 82 S.Ct. 780, 7 L.Ed.2d 798. There is no merit, however, in Strachan's contention that the judgment in favor of the shipowner is not supported by the verdict. The jury found that Rorie's injuries were proximately caused by the negligence of the hoist operator, and the evidence shows as a matter of law that the operator was the borrowed employee of Strachan at the time. Breach of the implied warranty is thus established. Strachan does not complain of the charge and has consistently taken the position that Special Issues Nos. 12 and 13 were entirely proper.

The judgment of the Court of Civil Appeals is reversed, and that of the trial court is affirmed.

DENTON and DANIEL, JJ., not sitting.