The CITY OF GALVESTON, Plaintiff,

v.

KERR STEAMSHIP CO., INC., et al.,
Defendants.

Civ. A. No. 71–G–61.

United States District Court,
S. D. Texas,
Galveston Division.

July 23, 1973.

Ben Powel of McLeod, Alexander, Powel & Apfel, Galveston, Tex., for plaintiff.

Robert Eickel of Eickel & Davey, Houston, Tex., for defendants.

NOEL, District Judge.

## MEMORANDUM AND ORDER

In this consolidated case, the City of Galveston, as owner and operator of the Galveston Wharves, is suing five (5) separate steamship companies for pier demurrage on bales of cotton which were stranded on the wharves during a 103-day longshoremen strike in 1968 and 1969. The disputed charges are based on the rates contained in plaintiff's Tariff Circular No. 4–D. Defendants present several theories justifying their refusal to pay the charges.

### Findings of Fact

1. On December 1, 1967, the Board of Trustees of the Galveston Wharves, acting on behalf of the City of Galveston, issued Tariff Circular No. 4–D, to be effective January 1, 1968. The Circular contained rules and regulations governing the operation of the Galveston Wharves facility.

a. Item # 5 of the Tariff defines pier demurrage or wharf demurrage as "A charge assessed against cargo remaining on or in terminal facilities after the expiration of free time unless arrangements have been made for storage."

b. Item # 30, titled Responsibility for Charges, provides,

> The use of waterways and facilities under jurisdiction of the Board of Trustees of the Galveston Wharves shall constitute a consent to the terms and conditions of this tariff, and evidences an agreement on the part of all vessels, their owners and agents, and other users of such waterways and facilities, to pay all charges specified, including any and all damages to property as provided in Item 75, or reissues, and to be governed by all rules and regulations contained in this tariff.

Plaintiff duly filed the tariff with the Federal Maritime Commission (sometimes referred to herein as F.M.C.). However, that body never formally approved or disapproved the tariff.

2. Defendants are Kerr Steamship Co., Inc., Texas Transport & Terminal Co., Inc., Lykes Brothers Steamship Co., Inc., States Marine-Isthmian Agency, Inc., and Lone Star Shipping, Inc. Defendants are agents for numerous ships which dock at Galveston. Lykes Brothers also owns and operates vessels. The responsibilities of vessel agents include securing a berth for incoming vessels and notifying the shipper of the outbound cargo where and when the vessel will arrive. Defendants are members of the West Gulf Maritime Association which collectively bargained the contract with the International Longshoremen Association. Negotiation of this contract was the subject of the strike by longshoremen in 1968–69.

3. Plaintiff computes pier demurrage after a vessel and its cargo has departed Galveston. A clerk reviews the ship's manifest at the steamship company office to determine the vessel's departure date and the nature of its cargo. Comparison with the report made by the shipper's agent reveals the time period during which a particular cargo remains on the docks.

4. Under Item # 185 of the Tariff Circular No. 4–D, outbound cotton is allowed fifteen (15) days "free time" at the wharves during which no charge is made. Thereafter, plaintiff charges pier demurrage on cotton at a rate of 2½¢ per bale per day for the first five days and 5¢ per bale per day for each day thereafter until removal.

5. Bills for demurrage contain the date loaded, date received, number of bales (if cotton), number of days of demurrage, rate per day, rate per bale and total charge. Bills are sent in the names of the vessel and of the steamship company at the latter's address because service of the bills on the departed vessel itself would be impractical.

6. Because the vast bulk of cargo is loaded within the allotted free time, demurrage is charged only infrequently. Accrual of demurrage usually results from action or inaction by either the shipper of the cargo or its agents, or the vessel or its agents.

7. It would be difficult if not impossible for plaintiff to determine which party is responsible for the accrual of demurrage in every instance. In addition, determining which shipper owned a particular cargo would be time consuming. Charging defendant steamship companies is the only practical manner of billing this expense.

8. Defendants, as agents for the vessels, routinely pay demurrage when the vessel is at fault and then seek reimbursement from the vessel owner or charterer.

9. When the shipper or its agent is at fault, the defendant who is billed for the demurrage notifies the shipper's agent of the charge and refrains from paying Galveston Wharves until the shipper's agent has paid the defendant. Plaintiff is aware of the practice but does not acquiesce in it, being of the view that defendants are liable for demurrage regardless of who is responsible for the delay. There is clearly no agreement to await payment by the shipper or its agent. The parties have disputed the issue of defendant's liability for several years. Nevertheless, prior to this incident, and apparently because of the small charges involved, neither party has resorted to the courts or the Federal Maritime Commission for resolution of the dispute.

10. The strike by the International Longshoremen Association over the new contract began on December 20, 1968 and ended April 2, 1969. Plaintiff has no contract with the I.L.A. and accordingly, had no control over the strike or the negotiations. Defendants are members of the West Gulf Maritime Association, the other party to the I.L.A. contract, and thereby had some control over the strike's duration.

11. During the strike no cotton moved through the Port of Galveston. Neither plaintiff nor defendant could have secured the manpower necessary to load cotton on to or off of the wharves.

12. Subsequent to the strike's conclusion, plaintiff sent demurrage bills to defendants and other steamship companies. Demurrage was charged for the period of the strike as follows:

(1) Cotton on free time on December 20 remained on free time for the duration of the strike.

(2) Cotton which had been on the wharves for more than 15 but less than 20 days was assessed the 2½¢ rate provided in the tariff.

(3) Cotton which had been on the wharves for more than 20 days was charged 2½¢, rather than the 5¢ rate provided in the tariff.

At the conclusion of the strike, plaintiff resumed counting days for purposes of

assessment of additional demurrage where appropriate.

13. The tariff does not provide for reduction or exemption of demurrage charges in the event of a strike. Plaintiff unilaterally decided to charge the reduced rates which it assessed. Under the terms of the tariff, plaintiff could have charged all cargo with demurrage at the usual, gradually increasing, rates for the duration of the strike. The decision to reduce the demurrage charge was rational, reasonable and nondiscriminatory.

### Conclusions of Law

Tariff Circular No. 4–D is a valid and enforceable tariff. Although the tariff schedule was promptly filed with the Federal Maritime Commission, it was never formally approved by that body. Defendants claim the tariff is unenforceable until it has been approved by the F.M.C., citing Section 15 of the Shipping Act of 1916, 46 U.S.C. § 814 and this Court's opinion in National Bank of North America v. S.S. Oceanic Ondine, 315 F.Supp. 386 (S.D.Tex.1970).

Section 15 provides in part that

All agreements, modifications, or cancellations made after the organization of the Board shall be lawful only when and as long as approved by the Board, and before approval or after disapproval it shall be unlawful to carry out in whole or in part, directly or indirectly, any such agreement, modification, or cancellation.

By its plain terms, Section 15 applies only to agreements between persons subject to the Act: (1) fixing or regulating transportation rates or fares; (2) giving or receiving special rates, accommodations or other special privileges or advantages; (3) controlling, regulating, preventing or destroying competition; (4) pooling or apportioning earnings, losses or traffic; (5) allotting ports or restricting or otherwise regulating the number and character of sailings between ports; (6) limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; or, (7) in any manner providing for an exclusive, preferential or cooperative working arrangement. The statute defines agreement to include understandings, conferences and other arrangements.

The tariff in question was promulgated by the Galveston Wharves to govern the operation of the wharves facility. First, although the statute is to be construed most broadly, Volkswagenwerk Akt. v. F.M.C., 390 U.S. 261, 88 S. Ct. 929, 19 L.Ed.2d 1090 (1968), a tariff is obviously not a multiparty agreement. Nothing in the record suggests that this tariff is anything other than a set of rates, rules and regulations unilaterally issued by the owner of the facility. Secondly, neither the tariff provisions relevant here, nor any other tariff provision, fit the categories enumerated in the statute. In Rorie v. City of Galveston, 471 S.W.2d 789 (Tex.1971), the Texas Supreme Court adopted the view that Section 15 of the Shipping Act does not apply to a Galveston Wharves tariff. The court there enforced a provision in a predecessor to Circular No. 4–D against the claim of unenforceability for lack of F.M.C. approval under Section 15.

Counsel for the Federal Maritime Commission filed an amicus brief in the *Rorie* case supporting enforcement of the statute. Although the courts are the final authority on issues of statutory construction, F.T.C. v. Colgate-Palmolive, 380 U.S. 374, 385, 85 S. Ct. 1035, 13 L.Ed.2d 904 (1965), the construction put on a statute by the agency charged with administering it is entitled to deference by the courts. N. L.R.B. v. Hearst Publications, 322 U.S. 111, 131, 64 S.Ct. 851, 88 L.Ed. 1170 (1944). This is particularly so if the construction has been consistent and of long duration.

In the amicus brief, the Commission contended the tariff was not an agreement within the meaning of Section 15 but was instead governed by the Com-

mission's General Order 15, 46 C.F.R. § 533, issued pursuant to Sections 17 and 21 of the Shipping Act, 46 U.S.C. §§ 816, 820.[1] That order requires all persons carrying on the business of furnishing wharfs, docks, warehouses, or other terminal facilities to file a schedule or tariff showing all rates, charges, rules and regulations governing the operation of the facility with the F.M.C. The order does not require the Commission's explicit approval of any tariff. The Commission reviews the filed tariff, considers any objections and contacts the filing party if any changes are necessary. The predecessor to the Galveston tariff was challenged and upheld in Selden & Co. v. Galveston Wharves, 7 FMC 679, 1964 A.M.C. 1621 (1964).

▪ The Commission's interpretation of the Act is obviously most reasonable. Section 15 (46 U.S.C. § 814) applies to a broad range of agreements between parties who are subject to the Act. This section requires filing and approval of such agreements by the Commission. Section 17 (46 U.S.C. § 816) and the Commission orders issued pursuant thereto apply to unilaterally fixed rates, rules and regulations. This section requires filing but no formal approval. Tariff Circular No. 4–D plainly falls into the second category; it must be filed but needs no formal approval to be enforceable.

This construction of the statute is supported by the testimony. The plaintiff's employee responsible for filing papers with the F.M.C. testified to a system of informal responses from the Commission if any questions or irregularities are discerned in the filed document. The witness had never received either a formal approval or disapproval of a tariff provision. Given the tremendous number of rates, rules and regulations for each of many parties subject to the Act, this informal procedure is clearly a reasonable means of exercising supervision over maritime commerce.

This conclusion does not impeach the result in National Bank of North America v. S. S. Oceanic Ondine, supra, for two reasons. First, the primary reason for the Court's decision was the absence of equity in the claim made by the City of Galveston. Secondly, the city ordinance there in question had been neither filed nor approved by the F.M.C. *National Bank* is thus distinguishable from this case in that the ordinance was not filed. The ordinance was therefore unenforceable under either Section 15 (46 U.S.C. § 814) or Section 17 (46 U.S.C. § 816) and General Order 15. The Court adheres to its decision in *National Bank* but finds that case no bar to the conclusion here that Tariff Circular 4–D is valid and enforceable.

In accord with Item # 30 of the Tariff, pier demurrage charges for cargo remaining beyond free time may be assessed against vessels and their agents.

Defendants refer to the Item # 5 definition of pier demurrage as "a charge assessed against cargo remaining in or

---

1. Section 17 of the Act, 46 U.S.C. § 816 provides in part:

Every such carrier and every other person subject to this chapter shall establish, observe, and enforce just and reasonable regulations and practices relating to or connected with the receiving, handling, storing, or delivering of property. Whenever the Board finds that any such regulation or practice is unjust or unreasonable it may determine, prescribe, and order enforced a just and reasonable regulation or practice.

Section 21 of the Act, 46 U.S.C. § 820 provides in part:

The Federal Maritime Board and the Secretary of Commerce may require any common carrier by water, or other person subject to this chapter, or any officer, receiver, trustee, lessee, agent, or employee thereof, to file with it or him any periodical or special report, or any account, record, rate, or charge, or any memorandum of any facts and transactions appertaining to the business of such carrier or other person subject to this chapter.

These provisions apply to a public entity operating a terminal facility. California v. United States, 320 U.S. 577, 64 S.Ct. 352, 88 L.Ed. 322 (1944).

or on terminal facilities after the expiration of free time unless arrangements have been made for storage." Defendants also point to other charges which are charged against the vessel. Defendants conclude that these definitions preclude plaintiff from charging vessels or vessel agents with pier demurrage.

The definitions only deal with the manner in which charges are accrued. They do not purport to establish which parties are liable for the charge. Liability for the various charges is fixed by Item #30 of the Tariff, quoted in Finding of Fact 1. Items #5 and #30 are neither conflicting nor ambiguous.

A provision with similar language to that of Item # 30 was found effective and binding on the parties in Selden & Co. v. Galveston Wharves, supra.

■ . Obviously, the charge which the City of Galveston assesses against a party must be reasonably related to the party's use of the facility. As discussed in Findings of Fact 5, 6 and 7, assessment of pier demurrage against the vessel's agent is a reasonable charge.

■ Defendants' practice of delaying payment of some demurrage bills until payment to the defendant by the shipper's agent has never been acquiesced in by plaintiff. (Finding of Fact 9). The principle of estoppel is therefore not applicable to defeat plaintiff's claim.

■ Payment of the pier demurrage charged is not excused by the longshoremen strike. By citation to Restatement, Contracts § 461 and Williston, CONTRACTS § 1951A (Jaeger ed. 1938), defendants suggest the applicability of the contract doctrine of impossibility of performance. According to defendants, the strike made it impossible to perform the contract by removing the cotton. Defendants argue that they should not be charged demurrage for the cotton which remained on the wharves when it was impossible to remove it.

Defendants' appeal to the the impossibility of performance doctrine misconceives the purpose of a demurrage charge. Because of its distinctive nature, "[f]requently demurrage is assessed and liability attaches although the delay is not caused by the assessed party." Port Terminal Ry. Assn. v. Connell Rice & Sugar Co., 387 F.2d 355 at 357 (5th Cir. 1967).

■ Free time is a reasonable period during which it is contemplated that removal of the cargo will take place. As the charge for cargo which remains beyond the free time, demurrage, by definition, accrues when performance cannot be accomplished as contemplated. This failure of performance may be the fault of the vessel's agent or of other parties. It may result from equipment failure, weather, or governmental action. Many of the delaying events cannot be anticipated when the cargo is placed on the wharf. Accordingly, by its nature, demurrage is usually charged when an unforeseen event prevents performance, that is, removal of cargo within the free time. Demurrage is the rental charge made for occupation of the facility until performance can be completed.

■ It is therefore irrelevant to the imposition of demurrage that it is impossible to av ι. . incurring the expense, or that some other party caused the delay. Absence of fault will not excuse the liability. Pennsylvania R. R. v. Moore-McCormack Lines, Inc., 370 F.2d 430 (2nd Cir. 1966). By use of the facility, a party must accept the potential liability for these expenses as imposed by the tariff. Houston Belt & Terminal R. R. v. Connell Rice & Sugar Co., 411 F.2d 1220 (5th Cir. 1969).

■ Obviously the party seeking to impose the charge may not be responsible for the delay. Port Terminal R. R. Assn. v. Connell Rice & Sugar Co., 387 F.2d 355 (5th Cir. 1967). This exception does not apply here because the City of Galveston clearly had no control over the strike.

■ Although defendants' liability is not dependent upon their responsibility for the strike, if either party is to be considered responsible, it is the defendants. As members of the West Gulf

Maritime Association, they are signatories to the contract with the International Longshoremen Association which was the subject of the strike. It is more equitable that pier demurrage, as an expense of the strike, should be borne by a party to the collective bargaining, such as defendants, than by an entity completely powerless to prevent or terminate the strike, such as Galveston Wharves.

The other legal defenses urged by defendants lack merit and deserve no extended discussion.

The Court concludes that plaintiff, the City of Galveston, must prevail in its claim against the several defendants. Judgment shall issue for plaintiff for damages together with interest and attorneys' fees, as stipulated by the parties. Plaintiff shall prepare a judgment in accordance with this Memorandum and Order, approved as to form by defendants, and submit same to the Court within fifteen days.

The foregoing constitutes the Court's Findings of Fact and Conclusions of Law. Any finding of fact deemed to be a conclusion of law is adopted as such; any conclusion of law deemed to be a finding of fact is adopted as such.