**JUGOSLAVENSKA OCEANSKA
PLOVIDBA, Appellant,**

v.

**GULF ATLANTIC WAREHOUSE
COMPANY, Appellee.**

No. 16217.

Court of Civil Appeals of Texas,
Houston (1st Dist.).

Feb. 28, 1974.

Rehearing Denied April 4, 1974.

Kenneth D. Kuykendall, Houston, for appellant; Royston, Rayzor, Cook & Vickery, Houston, of counsel.

Jack L. Allbritton, Houston, for appellee; Fulbright, Crooker & Jaworski, Houston, of counsel.

EVANS, Justice.

This appeal results from a suit brought by plaintiff, Samincorp., Inc. against defendant, Jugoslavenska Oceanska Plovidba, a steamship company, and Gulf Atlantic Warehouse Company, the owner and operator of the Longreach Dock facility in the port of Houston, to recover damages for the loss of twelve drums of nickel alloy scrap. In a trial before the court without a jury, it was stipulated that Samincorp owned forty drums of cupro nickel tubing scrap which was to be shipped from Houston to Genoa, Italy, aboard the vessel Admiral Zmajevic; that the forty drums were unloaded at the Gulf Atlantic Warehouse Company Longreach Dock; that the steamship company's clerk, Billy Vestal, acknowledged delivery by signing a freight delivery receipt, and that subsequently while the vessel was preparing to load cargo, the vessel's clerk discovered that twelve drums of the nickel scrap were missing. It was further stipulated that the only issue for determination was which of the two defendants, the warehouse company or the steamship company, was responsible for the loss of cargo while in the dock facility. Upon the basis of this stipulation and the evidence presented, the trial court entered judgment in favor of the plaintiff, Samincorp, against the steamship company for the amount of $5,500.00 and denied all other claims and cross-claims. The trial court filed findings of fact and conclusions of law which established the basic facts indicated above and additionally, among other facts, found:

1. That the cargo carrier was a common carrier by water for hire;

2. That the cargo's owner, through its freight forwarder, had arranged to place aboard the Admiral Zmajevic for shipment of the cargo to Genoa, Italy; and that the steamship company was represented locally in Houston by Gulf Coast Shipping Company, its agent;

3. That pursuant to the freight forwarder's delivery instructions, and in accordance with custom and practice, the nickel alloy scrap was delivered by truck to the warehouse company's office at Longreach Docks where a dock service order was picked up by the driver and the truck then proceeded to Truck Ramp No. 5 at the docks, which is adjacent to Berth 5 where the vessel was expected to arrive. The warehouse company's employees then unloaded the forty drums of cargo, placed the drums on pallets, four to a pallet, making a total of ten pallets. These pallets were then taken to location 93E in the transit shed, a large wharfside building adjacent to Berth No. 5. The court found that such location was within the "vessel's berth" as that term is used in the trade and in the tariff referred to below;

4. That also in accordance with custom and practice, the dock foreman then tendered the cargo to the steamship company by placing five copies of the dock service order in a receptacle assigned to its agent. Gulf Coast Shipping Company, such dock service orders being designated as "Freight Delivery Receipts."

5. That the warehouse company only rented space in its transit sheds and on its wharves to steamship companies utilizing the wharves for the assembly and distribution of cargo; that the warehouse company had the exclusive right to unload inland conveyances bringing cargo to the docks

for ultimate export; that in accordance with custom and practice the warehouse company unloaded and placed the cargo in particular locations in the transit sheds and tendered delivery of the cargo to the steamship companies through their agents. The steamship agent had a clerk who supervised the assembly and loading of the cargo from the transit sheds and docks onto the various vessels and a box or receptacle on the premises of the docks was maintained so that the freight delivery receipts might be deposited for the steamship agents. The steamship clerk would then take the freight delivery receipts from the box and go to the location where the cargo had been spotted in the transit shed, count the cargo and check it and then sign that portion of the dock service order entitled "Freight Delivery Receipt" indicating that the steamship agent had received the cargo from the Longreach Dock.

6. There was a tender of the particular cargo in question from the warehouse company to the steamship company through its agent, Gulf Coast Shipping Company, and in accordance with custom and practice the steamship clerk, Billy Vestal, signed the dock service order entitled "Freight Delivery Receipt" and returned it to the office at Longreach Docks, indicating receipt of the entire 40 drums of cargo.

7. That the Admiral Zmajevic arrived at Longreach Dock several days later. The loading of cargo from the transit sheds was the sole responsibility of the steamship company, and after placing cargo in the transit sheds and tendering the cargo to the steamship company, the warehouse company had no further connection with the cargo. The cargo is loaded from the transit shed onto the vessels by employees of a stevedore company, an independent contractor employed by the steamship line, and the warehouse company never again touched the cargo and in fact could not do so except with permission of the steamship agent.

8. That Longreach Docks is a privately operated terminal facility on the Houston Ship Channel; there are other private terminals on the channel and one public terminal operated by the Port of Houston Authority of Harris County. The Port of Houston Authority has for many years had on file with the Federal Maritime Commission its Tariff covering rules, regulations and rates regarding services available as a terminal operator and all of the private terminals including Gulf Atlantic Warehouse Company, have adopted that tariff as their own and have likewise filed copies with the Federal Maritime Commission. Copies of the Tariff are printed and made available to all users of the terminal facilities.

9. Item 49 on First Revised Page No. 51 of the Gulf Atlantic Warehouse Co. Tariff provides as follows:

"Steamship companies shall receipt daily for cargo tendered by Navigation District [Gulf Atlantic] in its capacity as exclusive unloader for railcars, motor vehicles, or other conveyances delivering same to its transit sheds and wharves, and steamship companies shall be responsible for such cargo from the time of placement in vessel's berth by the Navigation District.

"Cargo placed in the vessel's berth between 8 a. m. and 5 p. m. shall be receipted for promptly on the day it is unloaded, and prior to 6 p. m. Cargo placed in a vessel's berth after 5 p. m. and prior to 8 a. m. shall be receipted for not later than the following 9 a. m."

10. That the steamship company, prior to the event in question, had actual notice of the Tariff provisions through its agent, Gulf Coast Shipping Company, and was particularly familiar with the Item quoted above.

11. That Gulf Atlantic Warehouse Company in addition to its operation of the Longreach Dock facility but separate and apart therefrom operated a warehouse facility in which it issued warehouse receipts and accepted storage of commodities consigned to the owners of such commodities

but such business was never used for transit cargo consigned to vessels and passing through its dock facilities; conversely the latter facilities were not used by Gulf Atlantic for the storage or warehousing of commodities.

The trial court's conclusions of law determined:

1. That the Tariff was valid and enforceable and represented a contract between Gulf Atlantic and all users of the Longreach Dock facility, including the steamship company;

2. That as a matter of law, in accordance with the above quoted provision of the Tariff, the steamship company was responsible for the cargo after Gulf Atlantic placed it in the transit shed and tendered it to the steamship company;

3. That the steamship company had the status of a bailee for hire of the cargo and having failed to account for the twelve missing drums, was presumed to have been negligent with respect thereto and must bear the liability to the plaintiff;

4. There was no evidence that Gulf Atlantic was in any way negligent, nor did it breach any duties or warranties, express or implied, owed to plaintiff or to the steamship company. On the evidence, as a matter of law, Gulf Atlantic was not the bailee of the cargo at the time of the loss;

5. That the above quoted Item in the Tariff was not an attempt by Gulf Atlantic to exculpate itself from its own negligence but instead constituted a contractual agreement delineating responsibility, or custody and control, of cargo after it had been unloaded, placed in the transit shed and tendered to the steamship company.

Appellant, Steamship Company, in its first two points of error, asserts that the trial court erred in failing to impose liability against Gulf Atlantic Warehouse Company, as bailee, and in determining that responsibility for the loss rested with the steamship company. It argues, in this respect, that the Tariff provisions are void, as opposed to public policy; that they do not exempt Gulf Atlantic from its liability for negligence, as a bailee, and further that the warehouse company's own negligence probably caused the loss.

■ The trial court found that after placing the cargo in the transit sheds and tendering such cargo to the steamship company, the warehouse company had no further connection with the cargo. This finding is supported by the evidence.

The undisputed testimony of the warehouse company's officers and employees showed that its work was confined to the unloading of trucks on its premises and the delivery of the cargo to the shipping company; that it never provided any service or labor to load or unload ships. When an order was received from a freight forwarder, the warehouse company would call the steamship company or its agents and ask if they were ready to receive the cargo. The warehouse company never unloaded cargo on the dock that was not consigned to a vessel whose owner had given permission and stated that he would accept the cargo. After the cargo has been tendered to and accepted by the steamship company's shipping agent, the warehouse company's permission was not required to move the cargo from the transit shed for loading aboard ship; it ordinarily did not even know when this was done. After tender and acceptance by the shipping clerk the warehouse company could not move the cargo without the permission of the shipping clerk; sometimes the warehouse company moved the cargo around for its own convenience, particularly if it is a small quantity of cargo, but this was not the general practice. After the shipping clerk was given the receipt acknowledging tender and delivery, it was his obligation to see the cargo was placed aboard the ship. The stevedore company employed to load the ship dealt with the shipping clerk, not with the warehouse company.

There was testimony that in the event of a hurricane or rain upon cargo in the transit sheds, the warehouse company's employees would close the shed doors or move the cargo. If requested and paid an additional fee for its services, the warehouse company would also consolidate cargo in the sheds. It was also shown that the warehouse company maintained a fence for general plant protection around its premises; that outbound trucks were supposed to give the gateman a slip indicating the cargo they were removing; that steamship companies could not put up any type of structure without prior approval of the warehouse company, and that smoking was not permitted in the transit sheds. There was also testimony that the duty of the gateman was to direct cars and give information and that the warehouse company did not care if the steamship company hired guards or put fences around cargo in the shed if they did not block the fire lanes. An officer of the shipping company testified that he relied upon the warehouse company's fence and fire watch to protect the scrap and that he had received a number of complaints that cargo had been moved by the warehouse company and could not be found by the shipping clerk at the time of loading. The testimony of the officers and employees of the warehouse company indicates it did not maintain security guards on the dock premises to prevent pilferage and misplacement of cargo; that it never undertook any long-term storage of cargo in its transit sheds; and that steamship companies sometimes asked that specific cargo be placed within special cage-like structures within the sheds for which an additional moving charge was made.

 The evidence establishes, in our opinion, that the right of custody and control of cargo passed from the warehouse company's agent upon tender to and receipt by the shipping company's agent.

"Where goods are in the wharfinger's possession, to be sent onboard a vessel for a voyage, as soon as he delivers the possession and the care of them to the proper officers of the vessel, although they are not actually removed from his wharf, he is deemed exonerated from any further liability, and the goods are deemed to be in the constructive possession of the officer of the ship." Dobie on Bailments and Carriers, p. 165 (1914 Ed.).

In the case at bar, the shipping company's agent inspected and counted the cargo after delivery had been tendered by the warehouse company; upon finding the cargo to be correct, the shipping agent signed and issued to the warehouse company a freight delivery receipt evidencing that the full amount of the cargo had been tendered and received.

The shipping company's responsibility for the cargo commenced upon completion of the tender of delivery to and acceptance by its authorized agent for immediate transportation; the cargo need not have been actually placed upon the deck of the vessel to constitute an effective delivery. See 70 Amer.Jur.2d, Shipping, Sec. 450, p. 592. There was no retention of the right of custody or control by the warehouse company. The evidence that the warehouse company maintained a fence around its premises, had a guard at its main entrance to control ingress and egress to the wharf facilities, maintained a fire watch and general maintenance control over the transit sheds and their cargoes, does not, in our opinion, necessarily establish that the warehouse company retained custody or control over cargo which had been effectively delivered to the shipping company's agent. There is evidence in support of the conclusion that after tender of delivery to and issuance of receipt by the shipping company's agent, the warehouse company had no further responsibility with respect to cargo on its docks.

 The procedure which the evidence shows was customarily utilized at the Longreach facility for tender to and receipt by the shipping company's agent is in accord

with the Tariff's provisions designating responsibility. In the case at bar, the evidence shows a practical construction by the parties consistent with the written provisions of the Tariff. McCormick and Ray, Texas Evidence, Vol. 2, § 1687, p. 542. When the steamship company's authorized agent signed the freight delivery receipt acknowledging that the full amount of cargo had been received at the designated location on the dock, the steamship company became responsible for the cargo and must suffer any unexplained loss thereafter sustained. United States v. Central Gulf Steamship Corporation, 340 F.Supp. 473 (E.D.La.1972); Luckenbach S. S. Co. v. American Mills Co., 24 F.2d 704 (5th Cir. 1928). Even aside from the Tariff provisions, the customary procedures followed by the parties in this case would place responsibility with the shipping company after the cargo had been tendered to and receipted for by its authorized agent. 80 C. J.S. Shipping § 109, p. 901, and authorities there cited.

Appellant cites several cases which we find inapplicable to the facts of the case at bar. In Galveston Wharf Company v. Galveston, Harrisburg & San Antonio Railway Company, 285 U.S. 127, 52 S.Ct. 342, 76 L.Ed. 659 (1932), the wharf company, a common carrier, was held liable for imported goods unloaded on its pier to be reloaded onto boxcars. The United States Supreme Court, speaking through Chief Justice Hughes, affirmed the judgment of the Supreme Court of Texas which had reversed the Court of Civil Appeals and affirmed the trial court's judgment against the wharf company. The Court held that while no receipt had been given by the wharf company, the evidence showed that the steamship company did not require a receipt before the wharf company could remove shipments from the wharf, and that receipts were often given a considerable time after such removal. The Court held that the trial court was entitled, on the evidence presented, to conclude that the shipment had been placed under the complete control of the wharf company, to be handled according to its own convenience, and should therefore be deemed to have been delivered to the wharf company.

The case of California & Hawaiian Sugar Refining Corp. v. Harris County Houston Ship Channel Nav. Dist. et al, 27 F.2d 392 (S.D.Tex.1928), is also distinguishable in that the suit concerned only the cargo owner and the wharf operator, which was held liable for sugar damage caused by water from a broken water main. It was clear in that case that the wharf owner was negligent in causing the loss and therefore liable; there was, however, no question of liability of the vessel owner or other carrier. The court's holding, in that case, with respect to exculpatory provisions in the Tariff are in our opinion also inapplicable to the case before us.

Another case cited by the appellant is Chilewich Corp. v. Manchester Terminal (an unreported case) (A.D.2160), decided February 22, 1965 in the United States District Court for the Southern District of Texas, Houston Division. In Chilewich, the parties operated under the same tariff and under nearly identical procedures to those of those of the instant case. The distinguishing factor in Chilewich is that the cargo was lost *before* the time it was receipted for by the steamship company. The wharf company contended that the deposit of the "Dock Work Order" in the box of the steamship agency constituted a tender of the hides and that under the provisions of the above quoted section of the Tariff, the steamship agency was responsible in the event the hides could not be found. The court found that the steamship company had never taken actual physical delivery of the hides and that the "unaccepted tender" of the bailed property did not relieve the wharf company of its responsibility for the cargo. The court held it was unnecessary to pass on the validity and applicability of another section of the Tariff providing that the District would not be responsible for injury or loss of any freight being loaded or unloaded at the public wharves unless caused by its own

negligence for the reason that under that provision the wharf company would be liable for its negligence.

Appellant also argues that the warehouse company expressly retained the "right to control the loading and unloading of all freight handled on these facilities and rates to be charged," referring to the language of Item 6 of the Tariff, a provision captioned "Handling, Loading and Unloading." It asserts that when this provision is construed strictly against the drafter, the proper conclusion is that the warehouse company retained the right to control all handling of cargo on the wharf. This argument appears to be without merit.

The Supreme Court in *Universal CIT Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154 (1951), held that where only one reasonable meaning clearly emerges after applying established rules of interpretation to the contract the rule of strong construction against the author cannot be evoked. The language of Item 6 speaks only to inland conveyances and does not purport to deal with the loading of ships. The entire sentence from which appellant extracts the language upon which it relies reads:

> "Without preference or discrimination and in order to promote the orderly receipt and dispatch of railroad cars and motor vehicles the Navigation District reserves the right to control the loading and unloading of all freight handled on these facilities and the rates to be charged." (G.A. Ex. #9).

Taking the language of this provision as a whole it is not reasonable to conclude that the warehouse company was exerting a right to control the handling and loading of cargo aboard ships after tender had been made to the shipping agent.

Appellant further argues that the provisions of the Tariff imposing responsibility on the steamship company for the cargo "from time of placement in vessel's berth" are void as opposed to public policy.

Appellant argues that through unequal bargaining position, the warehouse company has sought to arbitrarily impose upon the steamship company a contract provision exculpating itself from liability for loss of cargo while the cargo rested in its custody and control in the transit shed. Appellant cites *Bisso v. Inland Waterways Corp.*, 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955), and *Crowell v. Housing Authority of the City of Dallas*, 495 S.W.2d 887 (Tex.Sup. 1973). We believe appellant misconstrues the intent and effect of the Tariff provision. As we read the Tariff, it merely specifies the time when (i. e., placement "in vessel's berth") the steamship company shall become responsible for tendered cargo and requires that the steamship company receipt for such tendered cargo on a daily basis. This provision does not exculpate the warehouse company from liability for loss during the period it retains responsibility for the cargo, nor does it compel the steamship company to issue receipt for any cargo which has not been inspected and accepted by it. The Tariff does not seek to impose risk of loss on either party; it merely designates a particular point in the transit process when the steamship company must either reject tender or accept tender and issue its receipt evidencing assumption of responsibility. See *Rorie v. City of Galveston*, 471 S.W.2d 789 (Tex. Sup.1971). The Tariff merely designates the time when delivery to the vessel owner becomes effective. Risk of loss naturally follows effective delivery to the carrier, even though the carrier does not immediately load the cargo. See *Finck Cigar Factory v. American Railway Express Co.*, 283 S.W. 219 (Tex.Civ.App.—Galveston 1925, n. w. h.).

The evidence in the record reflects that the warehouse company was not charging warehouse fees for the storage of cargo, but was charging the shipper for unloading, palletizing and placing the cargo in the transit shed and for administrative services and preparation of the work order. These charges were based upon the weight of the cargo. In addition there was a

charge made to the steamship company for shed hire and dockage which was based upon the weight of the ship. The Tariff provides that after fifteen days of "free time" in the sheds, the warehouse company may charge a wharf demurrage; such charge to be paid by the vessel owner. It was not the contention of the steamship company that the fees for the use of the docks and the sheds were unreasonable. There is no evidence that the warehouse company was receiving payment for storage responsibility after the cargo was tendered to and receipted for by the steamship company's agent; the warehouse company's dock service receipts clearly specify that they do not constitute warehouse receipts.

■ Appellant further argues that even if the provisions of the Tariff are not void as against public policy they are not effective in the instant case because the warehouse company did not place the cargo "in vessel's berth" as required. Appellant argues that the warehouse company's personnel knew the vessel was to load cargo at Berth No. 5 but that the cargo was placed at Berth No. 6. The evidence shows that the "vessel's berth" is an area roughly the length of the ship and that cargo is customarily placed within those limits. There was testimony that ships of today are longer than older ships and therefore extended beyond the older designation of berth numbers; that a ship could "hang into" Berth 6 or Berth 4, depending on what was in there when it came into the dock. Since the shipping clerk actually inspected the cargo after it was placed by the warehouse company, and indicated by signing the receipt that it had been placed at a proper location, we find no merit in appellant's complaint.

Appellant further contends that the Tariff does not exempt Gulf Atlantic from liability because its own negligence probably caused the loss. The trial court found that there was no evidence as to what happened to the missing drums as they were never found. This finding is fully supported by the evidence and appellant's argument is rejected.

Appellant's first and second points of error are overruled.

■ Appellant's third point of error is that the Tariff is void because the agreement was not approved by the Federal Maritime Commission in accordance with 46 U.S.C. § 814. The pertinent portion of that law reads as follows:

"Every common carrier by water, or other person subject to this chapter, shall file immediately with the Commission a true copy, or, if oral, a true and complete memorandum, of every agreement with another such carrier or other person subject to this chapter, or modification or cancellation thereof, to which it may be a party or conform in whole or in part, fixing or regulating transportation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; controlling, regulating, preventing, or destroying competition; pooling or apportioning earnings, losses, or traffic; allotting ports or restricting or otherwise regulating the number and character of sailings between ports; limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; or in any manner providing for an exclusive, preferential, or cooperative working arrangement. The term 'agreement' in this section includes understandings, conferences, and other arrangements."

The provisions of the Tariff in question do not fit within any of the Tariff classifications enumerated above and we hold that prior approval would not have been necessary. See Rorie v. City of Galveston, supra.

The judgment of the trial court is affirmed.