**BAKER OIL TOOLS, INC., Plaintiff,**

v.

**DELTA STEAMSHIP LINES, INC., and
Port of Houston Authority of Harris
County, Texas.**

**Civ. A. No. 72–H–834.**

United States District Court,
S. D. Texas,
Houston Division.

Oct. 15, 1974.

Brown & Teed, William C. Bullard, Houston, Tex., for plaintiff.

Royston, Rayzor, Cook & Vickery, Kenneth D. Kuykendall, Houston, Tex., for defendant Delta Steamship Lines, Inc.

Fulbright & Crooker, Jack L. Allbritton, Houston, Tex., for defendant Port of Houston Authority of Harris County, Texas.

## MEMORANDUM OPINION AND ORDER

SEALS, District Judge.

This suit in admiralty, 28 U.S.C. § 1333, concerns the unexplained disappearance of four boxes of oil field equipment from City Dock 19 in the Port of Houston. The equipment was on the dock awaiting transport from Houston to Port Gentil, Gabon, aboard the S.S. DEL RIO, a vessel owned and operated by Delta Steamship Lines, Inc., (Delta). The claims and parties are as follows. The shipper and owner of this cargo, Baker Oil Tools, Inc., (Baker), filed suit against Delta for $21,916.00—the oil field equipment's estimated full market value. Delta answered denying liability and lodged a third-party complaint against the Port of Houston Authority of Harris County, Texas, (Port), the operator of City Dock 19. Baker than amended its complaint joining the Port as a defendant. Finally, the Port, while denying liability either as a defendant

or third-party defendant, filed a cross-claim against Delta for any amount that Baker might ultimately recover from the Port.

## I. THE FACTS.

Common Market Forwarders, Inc., (Common Market), a Houston forwarding agent, was engaged by the purchaser, Elf-Societe de Patroles D'Afrique Equatoriall, to arrange for the ocean shipment of this cargo from Houston to Port Gentil. On July 20, 1971 Common Market received an export invoice from Baker indicating that the equipment was ready for shipment. Upon receipt of this document, Leon Templet, a Common Market employee, consulted the available shipping digests or schedules for the vessel with the earliest time of arrival at Port Gentil. He was concerned with the earliest possible arrival time because the purchaser had indicated a desire for quick delivery.

Templet selected the S.S. DEL RIO and on or about July 20, 1971 made arrangements with Delta by telephone for space aboard the vessel. This type of oral booking is not unusual in the Port of Houston for small shipments.[1] Templet testified that when he made the oral booking he was advised by a Delta representative that the S.S. DEL RIO would sail from Houston on August 4, 1971 and arrive at Port Gentil on September 1, 1971.

After making the oral booking, Templet sent a business form containing delivery instructions to Baker's Houston facility. This communication, which was received by Baker on July 26, 1971 directs that the cargo be delivered as soon as possible to City Dock 19 for transport aboard the S.S. DEL RIO. Baker was advised that the vessel would sail on August 4, 1971.

Baker delivered the cargo by truck to City Dock 19 on July 30, 1971. Consistent with Port procedure, the truck was unloaded by Port employees and the cargo was placed in the berth assigned to the receiving vessel. A clerk employed by Delta signed a dock receipt on the day of delivery indicating that the cargo had been tendered to Delta by the Port. This receipt was given pursuant to Port of Houston Tariff No. 8, Item 49, which provides as follows:

Steamship companies shall receipt daily for cargo tendered by Navigation District in its capacity as exclusive unloader of railroad cars, motor vehicles, or other conveyances delivering same to its transit sheds and wharves, and steamship companies shall be responsible for such cargo from time of placement in vessel's berth by the Navigation District.

Cargo placed in a vessel's berth between 8:00 A.M. and 5:00 P.M. shall be receipted for promptly on the day it is unloaded, and prior to 6:00 P.M. Cargo placed in a vessel's berth after 5:00 P.M. and prior to 8:00 A.M. shall be receipted for not later than the following 9:00 A.M.

The next major event occurred on August 16, 1971 when Templet became concerned because he had not received an on board bill of lading and checked a Delta shipping schedule. It indicated that the S.S. DEL RIO had not yet arrived at the Port of Houston and that Port Gentil had been cancelled as a port of call. He immediately located another vessel, the S.S. MISSOURI, which was scheduled to sail for Port Gentil on August 16, or 17, 1971, and set about having the cargo transferred from Delta's berth to the berth of the S.S. MISSOURI. Templet contacted Delta to discuss the contemplated transfer and to determine exactly

---

1. For larger shipments a form agreement entitled Confirmation of Freight Contract is normally executed by the carrier and freight forwarder. It sets forth the cargo to be carried, its destination, and the freight rate to be applied, and the date the cargo is to be at shipside. It also provides: "This contract is subject to all the terms and conditions and to all the exceptions of our regular form bill of lading, a copy of which will be furnished to you on request."

where the cargo was located. These arrangements were apparently acceptable to Delta and Templet issued a work order to the Port authorizing the move. Had the cargo been at Delta's berth on August 16th as supposed, the entire matter would probably have ended on an amicable note. It was nowhere to be found, however, and this litigation ensued.

## II. BAKER v. DELTA

 Baker's claim for the full value of the lost cargo is predicated on a simple bailment theory. This equipment was delivered to Delta pursuant to an agreement for ocean transport and disappeared while resting in Delta's assigned berth. "It is common ground that [an ocean carrier] responsible for the [cargo] under the contract of carriage, is liable for the loss of the [cargo] as a result of negligence and that a bailor makes out a *prima facie* case of negligence merely by showing delivery of the goods to the bailee and failure to return at the required time." Leather's Best, Inc. v. S.S. Mormaclynx, 451 F.2d 800, 812 (2d Cir. 1971), citing R. Brown, Personal Property, § 87 at 363 (1955). On the facts before this Court, Baker has unquestionably made a *prima facie* case and Delta has failed to come forward with any explanation of how the goods might have disappeared.

 In defense, Delta insists that its duties and responsibilities should, as a matter of law, be determined according to the provisions of its standard bill of lading rather than by the law of bailment. Reliance on the standard bill of lading is of little help to Delta on the issue of liability for negligence, but, as will be discussed below, it makes a great deal of difference with respect to the amount of damages allowable.

Paragraph three (3) of Delta's standard bill of lading extends the provisions of the Carriage of Goods by Sea Act, 46 U.S.C. § 1300 et seq. (Cogsa) to cargo in the custody of the carrier prior to loading and after discharge. "The provisions stated in said Act (except as may be otherwise specifically provided herein) shall govern before the goods are loaded on and after they are discharged from the ship and throughout the entire time the goods are in the custody of the Carrier." Cosga *inter alia* imposes responsibility upon the carrier for the loss of cargo due to negligence, but provides that "Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding *$500 per package* . . ." 46 U.S.C. § 1304(5). [emphasis supplied].[2]

Baker's *prima facie*, case, discussed above in a simple bailment context, applies with equal force under Cogsa. It has been established that the cargo was delivered in good order to Delta's berth and subsequently disappeared. If Cogsa controls, in order to escape liability Delta must show that the loss resulted from one of the statutory exceptions set out in 46 U.S.C. § 1304. Tupman Thurlow Co., Inc. v. S.S. CAP CASTILLO, 490 F.2d 302 (2d Cir. 1974); G. Gilmore & C. Black, The Law of Admiralty, § 3–43 (1957); 70 Am.Jur.2d, Shipping § 552. The requisite showing has not been made as absolutely no evidence was produced at trial to account for the loss.

 Baker is thus entitled to an award of damages against Delta under either the law of bailment or the standard bill of lading and Cogsa. The real controversy between these two parties is over the amount of the award. An ordinary bailor could successfully assert a claim for the full market value of the equipment—estimated at $21,916.00. If the bill of lading and Cogsa govern, Delta's liability would be limited to

2. Cogsa would not apply to cargo prior to loading by its own force. See 46 U.S.C. § 1311. But it is permissible for the carrier and shipper to stipulate in the bill of lading that Cogsa will apply during this period.

United States v. Central Gulf Steamship Corporation, 340 F.Supp. 473 (E.D.La. 1972); cf., G. Gilmore & C. Black, The Law of Admiralty, §§ 3–25, 127 (1957).

$2,000.00. The cargo was shipped in four separate boxes which were "packages" within the meaning of 46 U.S.C. § 1304(5) quoted above.

Bills of lading are normally issued in the Port of Houston only after the cargo is actually aboard the vessel, and none was issued in this case. But, the absence of an executed bill of lading does not end the inquiry as evidenced by Luckenbach S.S. Co., Inc. v. American Mills Co., 24 F.2d 704 (5th Cir. 1928). In *Luckenbach* the shipper sought a judgment against the carrier for the market value of 1,450 costs which were destroyed by fire while on a wharf awaiting shipment. No bill of lading had been issued at the time of the fire, but one was issued later covering a portion of the shipment which had been safely loaded aboard prior to the conflagration. This bill of lading contained a clause exempting the carrier from liability for loss by fire.

The shipper argued that the carrier was in effect an insurer of the cots and could not seek shelter in a bill of lading issued after the loss occurred. The court disagreed, stating that the bill of lading could be looked to as evidence of the contract between the parties entered into at the time the goods were delivered and accepted.

" . . . In the circumstances, it cannot be inferred that it was the intention of the parties to enter into a contract that would bind the carrier as insurer; but an implied understanding arose from common business experience that the carrier would issue such bill of lading as it was its custom to issue to shippers in the usual course of its business. The Caledonia (C.C.Mass.) 43 F. 681, 685; aff., 157 U.S. 124, 139, 15 S.Ct. 537, 39 L.Ed. 644 . . . In the ordinary case of a shipment of goods, it is not to be assumed, upon proof of delivery without condition, that the carrier intends to become insurer; but a shipper, in the absence of a special contract, must be presumed to deliver his goods on the terms and conditions usually and customarily imposed by the carrier in the regular course of business." At 705.

This reasoning has been followed in a variety of cases dealing with destruction of or damage to cargo occurring after delivery to the carrier but prior to loading and the issuance of a bill of lading. In the ordinary case, a carrier may rely on the terms of its standard bill of lading, including limitation of liability provisions, if it is the common business understanding of the parties at the time of delivery that such a document will be issued. See, United States v. Central Gulf S.S. Co., 340 F. Supp. 473 (E.D.La.1972); Berkshire Knitting Mills v. Moore-McCormack Lines, Inc., 265 F.Supp. 846 (S.D.N.Y. 1965); John Deere & Co. v. Mississippi Shipping Co., 170 F.Supp. 479 (E.D.La. 1959); Eastern Outfitting Co. v. Pacific Mail S.S. Co., 26 F.2d 270 (N.D.Cal. 1928).

Baker has fashioned two arguments against the package limitation. First, Baker contends that *Luckenbach* and the cases following it are entirely distinguishable and do not support Delta's view that the unexecuted bill of lading, and thus the package limitation, is controlling in this situation. Baker submits that Delta cannot rely on *Luckenbach* because Delta had cancelled Port Gentil and thus had no intention of issuing a bill of lading when the cargo was lost. Second, Baker argues that the limitation cannot apply in this case because Cogsa permits the shipper to declare a higher valuation and Baker was not given notice of the $500.00 limitation and/or an opportunity to exercise the option.

The second argument is clearly dependent on the success of the first. If, under the *Luckenbach* rationale, the bill of lading was at all times in effect, Baker cannot escape the package limitation by pleading lack of notice and lack of an opportunity to declare a higher valuation. The provision in Delta's standard bill of lading extending Cogsa and the $500.00 package limitation to cargo be-

fore it is discharged is not at all extraordinary. It is a term of shipment usually and customarily imposed by Delta.[3]

Clause Four (4) of Delta's standard bill of lading provides as follows:

"It is also mutually agreed that the carrier has offered the shipper a choice of freight rates, the lower rate applying if the shipment is made at the value specified in this paragraph and a higher rate applying if the shipment is made at a higher value; that unless, before shipment, a higher valuation is declared by the shipper in writing as the basis for freight and inserted in the bill of lading, the value of the goods, in view of the difficulty of ascertaining exact market value, shall, for all purposes of adjustment of claims be taken to be $500.00 per package . . . "

The freight forwarder, Templet, was at all times fully aware of this provision and acknowledged that customarily the time to declare a higher freight rate and avoid the $500.00 package limitation was at the time the booking agreement was made. In an effort to disassociate itself with Templet, Baker points to the fact that he was engaged by the African consignee. Clearly, however, insofar as Delta is concerned Templet was acting on behalf of both Baker and Elf-Societe de Patroles D'Afrigue Equatorriall.[4]

The argument based on the cancellation of Port Gentil is of more substance. Assuming, as Baker alleges, that the port was cancelled before the cargo was lost, does the rule that a carrier may rely on the terms of an unissued bill of lading remain applicable? Baker contends that it does not because the *Luckenbach* rule is bottomed on the intention of the carrier to issue a bill of lading and there can be no such intention where the port of destination has been cancelled.

This is a unique question and neither the parties nor this Court have found any direct authority pointing in either direction. It would seem, however, that on the peculiar facts of this case an exception to *Luckenbach* should be created.

The evidence indicates that Port Gentil was cancelled by Delta between July 30 and August 6, 1971 because not enough cargo had been booked to make a call profitable. According to both Templet and Mr. L. R. Westerman, the manager of Delta's Houston office, it is customary in the Port of Houston for carriers to notify freight forwarders by some direct method when a port is cancelled. Templet was not notified in this case. He discovered the cancellation while perusing a shipping schedule on August 16, 1971.

The *Luckenbach* court fashioned a rule to deal with situations where the carrier was attempting to perform the contract of carriage or at least stood ready to perform. Looking to the terms of an unissued bill of lading to determine the carrier's liability makes a good deal of sense in that context. The Court was doing nothing more than enforcing an agreement which was in fact reached between the parties and which both parties intended to perform.

■ Here, assuming that the goods disappeared after the port was cancelled, the carrier is in a much different position. It determined not to carry the cargo and gave no notice to the freight forwarder, leaving the cargo to pointlessly wait at the dock for a vessel which was not to carry it as promised.

---

3. Encyclopaedia Britannica, Inc. v. S. S. Hong Kong Producer, 422 F.2d 7 (2d Cir. 1969) is of no particular help to Baker on this point. In that case the Court refused to enforce a provision in a bill of lading for above deck stowage because it was an *unusual* provision and because the shipper had received only a short form bill of lading and had no actual notice of the stowage clause.

The provision at issue in the present case cannot in any way be considered unusual or something which the shipper could not reasonably expect.

4. Although the freight forwarder was to be compensated by the purchaser-consignee, he also represented Baker in making arrangements for ocean transport with Delta.

The failure to notify as is customary in this port deprived the shipper of the opportunity to promptly secure space aboard another vessel or re-take custody of the cargo—actions which might well have prevented the loss. There is no commercially cogent reason why a carrier should be permitted to seek shelter in its bill of lading under these circumstances.[5]

Should cargo be lost or damaged before the carrier has had a reasonable time to give notice or should a shipper fail to promptly retake custody after receiving notice, an argument could be made for giving controlling effect to limitation of liability provisions in the bill of lading. That question is not present here. This loss was discovered at least ten days after the port was cancelled and the freight forwarder had yet to be notified of the cancellation. In this Court's view a reasonable time for giving notice had clearly expired.

With the evidence produced at the hearing in this action it is not possible to determine precisely when the cargo disappeared. The only witness who had an opinion was Delta's dock clerk. He testified that he remembered seeing the boxes and that "more than likely" they disappeared no more than a day or two prior to August 16, 1971. Since Delta was in custody of the cargo and at all times in a uniquely better position than Baker to produce evidence on this issue, the Court accepts Baker's contention that the cargo disappeared after the port was cancelled. Baker is therefore entitled to a judgment against Delta for the full value of the cargo.

## III. DELTA v. PORT

Delta seeks to shift the ultimate burden of this loss to the Port on the theory that the cargo was at all relevant times in the Port's custody. In short, Delta alleges that the Port occupied the status of a bailee when the car disappeared. This position is unsupportable. The Port's responsibility as custodian of this cargo ended when it was placed in the S. S. DEL RIO's berth and receipted for by Delta's clerk.

"Where goods are in the wharfinger's possession, to be sent onboard a vessel for voyage, as soon as he delivers the possession and the care of them to the proper officers of the vessel, although they are not actually removed from his wharf, he is deemed exonerated from any further liablity and the goods are deemed to be in the constructive possession of the officer of the ship." Dobie on Bailments and Carriers, p. 165 (1914 Ed.)

Factually and legally possession and care of the cargo was delivered to Delta when its clerk signed the receipt acknowledging delivery to the proper berth. Port of Houston Tariff No. 8, Item 49, which is binding on Delta as a user of Port facilities provides as follows:[6] " . . . Steamship companies shall receipt daily for cargo tendered by Navigation District . . . and steamship companies shall be responsible for such cargo from the time

---

5. Leather's Best, Inc. v. S. S. Mormaclynx, 451 F.2d 800 (2d Cir. 1971) and David Crystal, Inc. v. Cunard Steamship Co., 339 F.2d 295 (2d Cir. 1964) do not require a different conclusion. In those cases the cargo was lost after being discharged from the vessel. It was clear in each case that the bills of lading remained in effect but they did not specify the precise responsibilities of the carrier after discharge. The Second Circuit Court of Appeals ruled in both cases that the carrier was a bailee and that the carrier could invoke any valid and applicable limitation of liability provision in its bill of lading. (In each case the limitation of liability provision was held invalid and/or in-

applicable for reasons not material to this suit.)
Here, by contrast, no bill of lading had been issued, the carrier had not performed or attempted to perform the contract of carriage, and the port of destination had been cancelled without the customary notice to the freight forwarder or shipper.

6. Port Tariff No. 10 provides:
"User" shall be deemed to include and apply to any vessel or person using any Navigation District property, facility or equipment or to whom or for whom any Service, work or labor is furnished, performed, done or made available by the Navigation District.

of placement in vessel's berth by the Navigation District." Delta has fired several broadsides against this provision but none have hit the mark. The Tariff clearly specifies when custody and control of cargo passes to the carrier and this Court can find no reason why it should be disregarded. Practically every argument pressed by Delta in this case was made by another carrier in Jugoslavenska Oceanska v. Gulf Atlantic Warehouse Co., 507 S.W.2d 892 (Tex. Civ.App.1974) writ ref n. r. e., and rejected. This Court is in agreement with that decision.

Delta cites Chilewich Corp. v. Manchester Terminal Corp. A.D. No. 2160 (S. D.Tex.1965) and California & Hawaiian Ref. Corp. v. Harris County Houston Ship Channel Navigation District, 27 F. 2d 392 (S.D.Tex.1928) for the proposition that the Tariff cannot relieve the Port of its obligation as a bailee of cargo on the pier awaiting delivery to a vessel. Neither of these decisions support that point. In *Chilewich* the court imposed liability on a wharf owner for cargo which was lost *before* it had been delivered to the carrier. The carrier's clerk had not receipted for the cargo. Here a receipt was given acknowledging delivery and triggering application of the Tariff provision.

*California & Hawaiian Sugar Ref. Corp.* is equally inapposite. There the wharf owner was held liable for negligent damage to cargo caused by a broken water main. There is no evidence that the Port was negligent in this case. The issue is the Port's status as a bailee. A holding that a wharf owner is liable for negligent injury to cargo is not tantamount to a holding that he is a bailee.

■ Turning to the Tariff itself, Delta contends that it is invalid as opposed to public policy and void because it has not been approved by the Federal Maritime Commission. The public policy argument is based on the well accepted doctrine that a party in a superior bargaining position cannot rely on contractual provisions which exonerate it from liability for negligence. Bisso v. Inland Waterways Corp., 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955) ; Crowell v. Housing Authority of City of Dallas, 495 S.W.2d 887 (Tex.1973).

■ The answer to this is that nothing in Tariff No. 8, Item 49 exonerates the Port from liability for its own negligence. It merely sets forth the point in time when the carrier assumes custody and control of cargo delivered to its berth.

We believe appellant misconstrues the intent and effect of the Tariff provision. As we read the Tariff, it merely specifies the time when (i. e., placement "in vessel's berth") the steamship company shall become responsible for tendered cargo and requires that the steamship company receipt for such tendered cargo on a daily basis. This provision does not exculpate the warehouse company from liability for loss during the period it retains responsibility for the cargo, nor does it compel the steamship company to issue receipt for any cargo which has not been inspected and accepted by it. The Tariff does not seek to impose risk of loss on either party; it merely designates a particular point in the transit process when the steamship company must either reject tender or accept tender and issue its receipt evidencing assumption of responsibility. See Rorie v. City of Galveston, 471 S.W.2d 789 (Tex.Sup. 1971). The Tariff merely designates the time when delivery to the vessel owner becomes effective. Risk of loss naturally follows effective delivery to the carrier, even though the carrier does not immediately load the cargo. See Finck Cigar Factory v. American Railway Express Co., 283 S.W. 219 (Tex.Civ.App., Galveston 1925, n. w. h.) *Jugoslavenska,* 507 S.W.2d at 898.

■ The point raised concerning approval by the Federal Maritime Commission is also without merit. This is not the type of agreement which requires

Commission approval. The types of agreements which require approval under 46 U.S.C. § 814 are those which:

1. fix or regulate transportation rates or fares;

2. give or receive special rates, accommodations, or other special privileges or advantages;

3. control, regulate, prevent or destroy competition;

4. pool or apportion earnings, losses or traffic;

5. allot ports or restrict or otherwise regulate the number and character of sailings between ports;

6. limit or regulate in any way the volume or character of freight or passenger traffic to be carried;

7. provide for an exclusive, preferential or cooperative working arrangement.

The Tariff on its face does not fit into any of these categories. Rorie v. City of Galveston, 471 S.W.2d 789 (Tex. 1971); City of Galveston v. Kerr Steamship Co., Inc., 362 F.Supp. 289 (S.D. Tex.1973).

Delta makes a novel argument that since three or four wharf facilities in Houston utilize the same Tariff provisions there is at least an implicit agreement to fix or regulate rates; to control, regulate, prevent or destroy competition; and to provide for an exclusive, preferential or cooperative working agreement. This theory fails for lack of proof.

 Finally, Delta seeks indemnity from the Port for breach of the warranty of workmanlike performance. Courts have made reference to this warranty in imposing liability for the unexplained disappearance of cargo upon stevedores who undertake to discharge and care for a vessel's cargo. Stein Hall & Co., Inc. v. S. S. Concordia Viking, 494 F.2d 287

(2d Cir. 1974); David Crystal, Inc. v. Cunard Steamship Co., Ltd., 339 F.2d 295 (2d Cir. 1964) cert. den. 380 U.S. 976, 85 S.Ct. 1340, 14 L.Ed.2d 271 (1965). But the analogy does not work at all on the facts of this case.

In those cases the stevedore, having custody and control of the cargo, was in a far better position than the vessel to adopt preventive measures and thereby reduce the risk of loss. In the instant case the Port, both as a practical matter and under the Tariff, has little to do with cargo which has been tendered to and accepted by the steamship company. It rests in the vessel's berth until loaded aboard by the steamship company or a stevedore employed by the steamship company. The Port does not control the loading operation and is not advised as to what cargo is being loaded. The Port does have the authority to transfer cargo from one place on the wharf to another but the evidence indicates that this is not done without the permission of the steamship company. Further, steamship companies can and have employed guards to protect precious cargoes without getting prior approval from the Port.

Both on the facts and under the Tariff, the Port did not undertake to store and care for this cargo for Delta and made no warranty which would be breached by the cargo's unexplained loss. Delta's claim for indemnity is denied.

## IV. BAKER v. PORT

 The findings of fact and conclusions of law previously made are essentially dispositive of this action. There is no evidence of negligence and the Port was not a bailee at the time this cargo disappeared. The Port took custody of this cargo from Baker only to unload it at Delta's berth. Baker was charged $23.54 for unloading and a nominal sum for wharfage. The wharfage fee is a charge placed on any commodity passing through the Port facilities and

is not for storage. Templet, the forwarding agent, had extensive knowledge of customary port procedures and was aware of Tariff No. 8, Item 49, and its clear implications. Baker as a "user" of the Port's facilities is bound by that provision.

Now that the issues of liability have been determined, the Clerk of the Court will issue a Docket Control Order setting a trial on the damage issues for the November/December 1974 Civil Assignment and will furnish all parties with a true copy of this Memorandum Opinion and Order.

### ORDER

The Court having this day considered Defendant Delta Steamship Lines, Inc.'s Motion for Reconsideration and for Entry of Additional Findings of Fact or in the Alternative to Reopen the Evidence to Allow Submission of Documentation to Provide Additional Support for Request of Additional Findings of Fact, and the Opposition of Plaintiff Baker Oil Tools and Third Party Defendant, Port of Houston Authority thereto, hereby orders:

Said motion is in all respects denied.

The Court feels that every legal issue presented by the pleadings and the Pretrial Order in this case has been adequately treated in the Memorandum Opinion and Order of October 15, 1974. Defendant's Request for Additional Findings of Fact and to Reopen the Evidence to Allow Proof of Additional Facts is denied as Defendant had an adequate opportunity to present those facts at trial and was aware of their bearing on the ultimate issues to be decided in this case. It is not the policy of this Court to permit piecemeal litigation except where the interest of justice would clearly be served. That does not appear to be the case here.